**NEW YORK CROSS HARBOR RAIL-ROAD TERMINAL CORPORA-TION, Plaintiff,**

v.

**CONSOLIDATED RAIL CORPORATION, Defendants.**

**No. 97–CV–3296 (ARR).**

United States District Court, E.D. New York.

Oct. 19, 1998.

Jacques Catafago, Law Offices of Jacques Catafago, New York City, John Heffner, Rea, Cross & Auchincloss, Washington, DC, for plaintiff.

Carol Ann Stevens, John K. Fiorilla, Watson, Stevens, Fiorilla & Rutter, New York City, John G. Harkins, Jr., Gay Parks Rainville, Harkins Cunningham, Philadelphia, PA, Paul A. Cunningham, Harkins Cunningham, Washington, DC, for defendant.

### OPINION AND ORDER

ROSS, District Judge.

Plaintiff New York Cross Harbor Railroad Terminal Corporation ("NYCH") brought this action against defendant Consolidated Rail Corporation ("Conrail") al-

leging that Conrail violated the Sherman Act, breached its contracts with NYCH, breached its fiduciary duty to NYCH, breached implied covenants of good faith attendant to its contracts with NYCH, and committed tortious breach of its contracts with NYCH. The plaintiff requested both damages and injunctive relief. The defendant filed a motion to compel arbitration and/or refer the case to the Surface Transportation Board ("STB"), and to stay or dismiss the case pending completion of arbitration or STB proceedings; in the alternative, the defendant requested that the court dismiss the case for failure to state a claim. For the reasons stated below, this court hereby grants the defendant's motion to compel arbitration, as to the majority of the plaintiff's claims and stays the plaintiff's remaining claims in this court pending the results of arbitration.

I. Factual Background and Procedural History

Plaintiff NYCH was established in 1983 as a Class III short line railroad after acquiring, with the approval of the Interstate Commerce Commission ("ICC"),[1] the assets and operations of the New York Dock Railway, which itself had previously acquired the assets of Brooklyn Eastern District Terminal Railway ("BEDT") in 1979. *See* Amend. Complaint at ¶¶ 4–6 & n. 2. NYCH performs rail freight service in Brooklyn, New York, and Jersey City, New Jersey, moving freight cars between those locations across New York Harbor by means of car floats.[2] *See id.* at ¶ 10. In doing so, NYCH links the Long Island

Rail Road ("LIRR") on the east side of the Harbor with Conrail on the west side, providing a connection between eastern New York City and Long Island and the national railroad system.[3] *See id.* Defendant Conrail began operations in 1976, pursuant to the Regional Rail Reorganization Act of 1973, *see* 45 U.S.C. §§ 701–797, by acquiring the operating properties of six bankrupt railroads in the Northeast and Midwest. *See* Pl.Memo. at 4. As a Class I railroad incorporated in Pennsylvania, Conrail currently provides freight rail service in fifteen eastern and midwestern states, the District of Columbia, and two Canadian provinces. *See* Amend. Complaint at ¶ 7. Both NYCH and Conrail are subject to regulation by the STB. *See id.*

NYCH and Conrail maintain an unusual relationship. As connecting railroads, they jointly provide freight transportation services to customers who wish to move goods between points south of New York City and eastern New York City or Long Island via the LIRR. *See id.* at ¶ 10. As a result, in some business situations, the two railroads act in concert—as partners, in a practical sense. However, because Conrail maintains a separate link with the LIRR, *see supra* note 3, NYCH and Conrail also compete for freight service which originates or terminates on the LIRR. As a result, in other business situations, the two railroads act as direct competitors.

Upon becoming the owner of the Greenville Yard in Jersey City in 1976, Conrail entered into a lease agreement with BEDT, the plaintiff's predecessor, for a portion of the Greenville Yard. *See* Def.

---

1. In 1995, Congress enacted the ICC Termination Act which replaced the ICC with the STB, an autonomous sub-agency within the U.S. Department of Transportation. *See* Pub.L. No. 104–88, 109 Stat. 803 (1995).

2. Car floats are barges with railroad tracks installed on their decks. Locomotives push or pull railroad cars on and off the car floats at special dock facilities, located at NYCH's Bush Terminal in Brooklyn and at Conrail's Greenville Terminal Yards in Jersey City, New Jersey. Tugboats then propel the car floats

across New York Harbor. *See* Amend. Complaint at ¶¶ 10–12.

3. Conrail maintains a separate direct interchange with LIRR at Fresh Pond Junction, New York. In order to access this interchange from locations south or west of New York, according to NYCH, Conrail must transport goods up to Albany and then back down to Fresh Pond Junction. *See* Amend. Complaint at ¶ 26.

Exh. 2; Amend. Complaint at ¶¶ 74–76. The lease agreement provided that BEDT would pay one dollar per year for the rights to operate the dock facility, *see id.* at ¶ 1–2, that, in return, BEDT would serve as Conrail's contractor for car float service, *see id.* at ¶ 1, that Conrail would lease one diesel-switching locomotive to BEDT upon request for fifty dollars per day, *see id.* at ¶ 2, that BEDT would be responsible for track maintenance but maintenance costs above $1.26 per car would be paid by Conrail, *see id.* at ¶ 3, and that Conrail would be responsible for rehabilitation of all leased trackage and facilities, *see id.*, as well as assorted other minor agreements. Upon NYCH's formation in 1983, Conrail and NYCH reached an agreement under which NYCH succeeded to BEDT's rights under the 1976 lease. *See* Def. Exh. 3.

Also in 1983, Conrail and NYCH entered into a Junction Settlement and Accounting Agreement ("Junction Agreement"), a comprehensive agreement created to govern all aspects of the parties' relationship as joint providers of freight transportation services. *See* Def. Exh. 4. In particular, the Junction Agreement provides detailed procedures for distributing the costs and revenues arising from joint provision of services and for settling disputes that arise therefrom. *See id.* Most importantly to this action, the Agreement contains the following section that provides for arbitration of disputes:

> "Either party may, upon written notice to the other party, refer any dispute or an event(s) of default and the subsequent process leading to the exercise of an option(s) to arbitration in Philadelphia, Pennsylvania, at the offices of the American Arbitration Association under the rules of the American Arbitration Association pertaining thereto, except that any arbitration proceedings shall be concluded within ninety (90) days after written notice of referral. The award of an arbitrator shall be final and binding upon the parties...."

*Id.* at ¶ 8. Both parties appear to agree that the Junction Agreement "is the controlling contract for any questions concerning obligations between NYCH and Conrail...." Pl.Memo. in Opp. at 16; *see* Def. Memo. at 10 ("[The Junction Agreement] comprehensively covers the NYCH–Conrail commercial relationship ...").

On January 20, 1993, Conrail and NYCH entered into a new thirty-year lease of the Greenville Yard property. *See* Def. Exh. B; Amend. Complaint at ¶ 97. During the same transaction, Conrail also sold to NYCH its interest in all assets installed on the leased property, including "structures, buildings, ... and bridges." *Id.* at § 3.1. All of the assets were expressly sold "as is." *Id.* at § 3.3. In addition, NYCH expressly assumed the obligation to "maintain, repair, and renew the Property and Assets at its own expense and with its own supervision and labor." *Id.* at § 4.4. The parties do not agree as to the scope of the 1993 lease and sale and whether its terms supersede the 1976 lease. *Compare* Pl. Memo in Opp. at 40 *with* Def.Memo. at 34. Moreover, plaintiff alleges that it agreed to the lease only after threats that its rejection would result in Conrail's abandonment of the Greenville Yard. *See* Amend. Complaint at ¶¶ 91–96.

The plaintiff's cause of action rests on the following allegations. According to NYCH, Conrail has recently engaged in various monopolistic, anti-competitive, and predatory actions which have undermined the ability of NYCH to compete and thus threatened to drive NYCH out of business. First, NYCH alleges that Conrail has intentionally and fraudulently misrouted railroad cars containing third party customers' cargo to avoid using the plaintiff's system. *See id.* at ¶ 60. In particular, NYCH alleges that Conrail has repeatedly disregarded its customers' express requests to route their cargo through NYCH, instead transporting the cargo on its own lines to its link with the LIRR at Fresh Pond Junction or via third party

carriers.[4] *See id.* at ¶¶ 54, 57. As a result, according to plaintiff, Conrail has unlawfully retained revenues due to NYCH. *See id.* at ¶ 56. Second, NYCH alleges that Conrail has offered its customers discriminatory, preferential rates to induce customers to use Conrail's Albany route to the LIRR rather than NYCH's more direct route. *See id.* at ¶ 61. According to plaintiff, the rates offered by Conrail to haul freight through Albany are below cost. *See id.* at ¶ 62. Third, NYCH alleges that Conrail has disseminated false information that NYCH is going out of business to shared customers and to NYCH shareholders and prospective investors. *See id.* at ¶¶ 63–66. Fourth, plaintiff alleges that Conrail illegally withheld monies owed to plaintiff for services rendered to joint third-party customers. *See id.* at ¶¶ 67–72. Fifth, plaintiff alleges that Conrail coerced NYCH into accepting the 1993 lease through threats to deny NYCH access to the Greenville Yard, an essential facility to NYCH's business. *See id.* at ¶¶ 91–96. Finally, plaintiff alleges that Conrail's violations of the 1976 lease of the GreenvilleYard—including overcharge for the use of Conrail's locomotives and refusal to perform required repairs—and its unlawful rescission of the 1993 lease have resulted in multiple denials of access to essential facilities and multiple acts of refusal to deal. *See id.* at ¶¶ 73–85.

In its first cause of action, plaintiff NYCH alleges that Conrail's actions detailed above constitute a violation of Section 2 of the Sherman Act and demands $100 million, trebled by operation of law, and injunctive relief. *See id.* at ¶¶ 106–13. In its second cause of action, NYCH alleges that Conrail's conduct constitutes a breach of the 1976 and 1993 leases of the Greenville Yard and demands $1 million in damages.[5] *See id.* at ¶¶ 114–16. In its third cause of action, plaintiff alleges that Conrail's conduct constitutes a breach of fiduciary duty and demands $100 million in compensatory and $500 million in punitive damages. *See id.* at ¶¶ 117–19. Finally, in its fourth cause of action, NYCH alleges that Conrail's actions constitute a tortious breach of contract and a breach of the "implied covenant of good faith and fair dealing attendant to all commercial contracts and contractual relations." *Id.* at ¶¶ 120–22. Plaintiff seeks $100 million in compensatory and $500 million in punitive damages its fourth cause of action. *See id.,* Demand for Judgment. Finally, the plaintiff requested that the court provide injunctive relief in the form of a reinstatement of the 1993 Greenville Lease. *See id.* at ¶¶ 109–11.

Defendant Conrail moved to compel arbitration of the plaintiff's complaint under the arbitration provision of the Junction Agreement. Conrail also moved the court to refer part or all of the case to the STB under the doctrine of primary jurisdiction. Conrail requested that the case be dismissed without prejudice or stayed during arbitration or STB proceedings. In the alternative, Conrail moved to dismiss the case for failure to state a claim.

## II. Motion to Compel Arbitration

■ "The Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.,* requires federal courts to enforce arbitration agreements, reflecting Congress' recognition that arbitration is to be encouraged as a means of reducing the costs and delays associated with litigation." *Deloitte Noraudit A/S v. Deloitte Haskins & Sells,* 9 F.3d 1060, 1063 (2d Cir.1993). Under § 4 of the FAA, a court confronted with a motion to compel arbitration

---

4. In the process, according to NYCH, Conrail has either disregarded, reissued, or even altered way bills to avoid the use of NYCH's system. *See* Amend. Complaint at ¶ 55.

5. Since NYCH does not even allege the existence of the Junction Agreement in its Amended Complaint, NYCH does not appear to be alleging breach of that contract. However, NYCH may be alleging tortious breach of that contract, as well as breach of an implied covenant of good faith attendant to that contract. *See infra.*

"shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."

9 U.S.C. § 4. The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). The FAA is the embodiment of an explicit Congressional policy favoring the enforcement of arbitration agreements. *See Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 625, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

■ In applying the FAA, courts have followed the guiding principle that arbitration is "a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). Accordingly, the Second Circuit has held that "courts asked to stay proceedings pending arbitration must resolve four issues: first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and

fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration."[6] *Oldroyd v. Elmira Savings Bank,* 134 F.3d 72, 75–76 (2d Cir. 1998); *see also Genesco v. T. Kakiuchi & Co.,* 815 F.2d 840, 844 (2d Cir.1987).

## A. Agreement to Arbitrate

■ In opposing the motion to compel arbitration, plaintiff NYCH concedes that the Junction Agreement contains an arbitration clause, but contends that the clause is neither binding nor mandatory, but rather merely optional. In support of this argument, plaintiff points to what it perceives as the permissive language of the arbitration clause: "Either party *may* . . . refer any dispute or an event(s) of default . . . to arbitration." Def. Exh. 4 at ¶ 8 (emphasis added). To illustrate that the parties understood the import of using the permissive term "may," the plaintiff refers to the numerous other times in the arbitration clause that the parties used the mandatory terms "shall" and "will." *See* Pl. Memo. in Opp. at 11; Def Exh. 4 at ¶ 8. As a result, according to NYCH, a plain language reading of contract reveals that there is no mandatory arbitration clause.

Unfortunately for plaintiff, courts have repeatedly rejected this very argument. *See Austin v. Owens–Brockway Glass Container Inc.,* 78 F.3d 875, 879 (4th Cir. 1996) (holding that agreement that "all disputes . . . *may* be referred to arbitration" triggers mandatory arbitration) (emphasis added); *American Italian Pasta Co. v. Austin Co.,* 914 F.2d 1103, 1104 (8th Cir.1990) (holding that agreement that "[i]f both parties agree that a dispute . . . cannot be settled . . . then such dispute *may* be submitted to arbitration" triggers mandatory arbitration) (emphasis added); *Lo-*

**6.** Courts must also decide whether either the making of the agreement or compliance therewith is in issue. *See Prudential Lines,* 704 F.2d at 63; 9 U.S.C. § 4. Here, plaintiff NYCH does not dispute that it agreed to the

Junction Agreement's arbitration clause nor that it has refused to arbitrate the dispute. As a result, this question may be resolved summarily in favor of arbitration. *See Prudential Lines,* 704 F.2d at 63.

cal 771, IATSE, AFL—CIO v. RKO General, Inc., WOR Division, 546 F.2d 1107, 1115–16 (2d Cir.1977) (holding that agreement that "[t]he parties *may* submit to arbitration" triggers mandatory arbitration) (emphasis added); *McCrea v. Copeland, Hyman & Shackman, P.A.,* 945 F.Supp. 879, 881–82 (D.Md.1996) (holding that agreement that "either party *may* petition the appropriate court . . . for an order compelling submission . . . to arbitration" triggers mandatory arbitration) (emphasis added); *Chiarella v. Vetta Sports, Inc.,* 1994 WL 557114, at *3 (S.D.N.Y.1994) (holding that agreement that "either party *may* submit the dispute to arbitration" triggers mandatory arbitration) (emphasis added); *Lopez v. Time, Inc.,* 1994 WL 88062, at *5 (S.D.N.Y.1994) (holding that agreement that a "grievance . . . *may* be submitted by either party . . . to an impartial arbitrator" triggers mandatory arbitration) (emphasis added); *cf. Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 204 n. 1, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985) ("The use of the permissive 'may' is not sufficient to overcome the presumption that parties are not free to avoid the contract's arbitration procedures."). Because parties may always agree to arbitrate a dispute, to interpret an arbitration agreement that uses the term "may" as permitting rather than mandating arbitration would violate the age-old principle that contracts must not be interpreted so as to render clauses superfluous or meaningless. *See Austin,* 78 F.3d at 879; *Chiarella,* 1994 WL 557114, at *3.

The one case that plaintiff cites in favor of its contention that the word "may" renders the arbitration clause permissive, *Arbitration Between Gangemi and General Electric Co.,* 532 F.2d 861 (2d Cir.1976), does not support the plaintiff's case. In *Gangemi,* the Second Circuit interpreted a contract that contained two arbitration clauses. The first clause provided that "[a]ny individual grievance involving a disciplinary penalty . . . *may* be submitted to arbitration by either party . . . ." *Id.* at 863

n. 2 (emphasis added). The second clause used identical language but appended the following phrase: "only . . . with prior written mutual consent [of the two parties]." *Id.* The Second Circuit noted that the first clause—the one directly analogous to the arbitration agreement at hand—was "concededly mandatory." *Id.* at 866. While the court did hold the second clause to be a "permissive" arbitration clause, the court appeared to rely substantially on the requirement of "mutual consent." *Id.* One year later, the court confirmed the narrow nature of the *Gangemi* holding, ruling an arbitration agreement that used the word "may" without "mutual consent" language to require mandatory arbitration. *See Local 771,* 546 F.2d at 1116.

Interpreting the language of the Junction Agreement in light of this extensive case law, there is no question that the Agreement's arbitration clause was intended as a mandatory and exclusive remedy. However, finding a binding agreement to arbitrate is only the first step in the arbitration analysis. This court must next decide whether the plaintiff's claims fall within the scope of the arbitration agreement.

### B. Scope of the Agreement to Arbitrate

██ In determining whether an agreement to arbitrate governs a particular claim, federal policy strongly favors arbitration. As the Supreme Court has stated, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. . . ." *Moses H. Cone Memorial Hospital,* 460 U.S. at 24–25, 103 S.Ct. 927. As a result, "while the question is governed by the intent of the parties, that intent will be broadly construed, and arbitration should be ordered 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' " *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.,* 67 F.3d 20, 27

(2d Cir.1995) (quoting *Warrior & Gulf,* 363 U.S. at 582–83, 80 S.Ct. 1347).

■ When the arbitration clause is broadly worded, the presumption of arbitrability is "particularly applicable." *AT & T Technologies,* 475 U.S. at 650, 106 S.Ct. 1415. As a result, broad arbitration agreements trigger arbitration of all disputes unless the resisting party can point to "the most forceful evidence of a purpose to exclude the claim from arbitration...." *Id.* According to the Second Circuit, to determine whether a claim falls within the scope of the agreement to arbitrate, courts must "focus on the factual allegations in the complaint rather than the legal causes of action." *Genesco,* 815 F.2d at 846. No matter what legal form the claim takes, it must be arbitrated "[i]f the allegations underlying the claims 'touch matters' covered by the parties' ... agreements." *Genesco,* 815 F.2d at 846 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth,* 473 U.S. 614, 625 n. 13, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)).

■ In this case, the plaintiff does not appear to dispute that the arbitration clause of the Junction Agreement is broadly worded. The clause covers "*any* dispute or an event(s) of default and the subsequent process leading to the exercise of an option(s)." Def.Exh. 4 at ¶ 8 (emphasis added). The clause can only be interpreted as subjecting any dispute arising under the contract to arbitration. Moreover, the Junction Agreement itself reaches broadly. As the plaintiff itself admits, "the Junction Agreement is the controlling contract for any question concerning obligations between NYCH and Conrail...." Pl.Memo. in Opp. at 16. This court finds that the Junction Agreement governs all questions involving the relationship between Conrail and NYCH when they act as joint providers of freight transportation services. *See* Def. Exh. 4.

Virtually all of the plaintiff's claims "touch matters" governed by the Junction Agreement.[7] First, the allegations underlying NYCH's antitrust claim generally involve alleged conduct by Conrail that either directly violates the Junction Agreement or affects the parties' relationship as joint providers of freight transportation services. The plaintiff's allegations of intentional and fraudulent misrouting of railroad cars and illegal retention of revenue obtained from joint customers and due to NYCH would, if substantiated, represent direct violations of the Junction Agreement. *See* Def.Exh. 4 at ¶ 3 (detailing obligations of Conrail and NYCH in distributing revenue from joint customers). Moreover, the plaintiff's allegations that Conrail provided potential customers with discriminatorily preferential rates and false information about NYCH in order to avoid sharing those customers directly relate to the Junction Agreement, in that Conrail's alleged actions would have been taken to avoid triggering the Agreement's fee-sharing requirements. While the anti-trust claim also encompasses NYCH's allegations that Conrail coerced it into accepting the 1993 lease revision and that Conrail breached the 1976 lease and the 1993 revision in order to put NYCH out of business—allegations that do not implicate the Junction Agreement—these allegations are relatively minor aspects of the claim.[8] As a result, NYCH's anti-trust claim clearly "touches matters" covered by the Junction Agreement and thus is within the scope of the arbitration provision.

■ The same allegations of fraudulent misrouting, illegal retention of revenues

---

7. Indeed, in its opposition memorandum, the plaintiff all but admits as much, confirming that "NYCH's claims are based upon the obligations and relationships contained and defined by the Junction Agreement." Pl.Memo. in Opp. at 19.

8. As discussed above, the plaintiff itself informed the court that the Junction Agreement provided the primary, if not the sole basis for its claims. *See* Pl.Memo. in Opp. at 19; *supra* note 7.

due NYCH, provision of discriminatory rates to joint customers, and dissemination of false and misleading information by Conrail underlie the plaintiff's second claim of breach of fiduciary duty. Indeed, plaintiff appears to claim that the alleged fiduciary duty arose from the two parties' partner-like relationship in dealing with joint third-party customers—the same relationship covered by the Junction Agreement. *See* Amend.Compl. at ¶ 32. As a result, plaintiff's fiduciary duty claim "touches matters" covered by the Junction Agreement and is thus covered by its arbitration provisions.

■ Similarly, the plaintiff's final claim of tortious breach of contract and breach of an implied covenant of good faith appears, at least in part, to "touch matters" covered by the Junction Agreement. Claims of tortious breach of contract and breach of an implied covenant of good faith are both predicated on the existence of an underlying contract. To the extent the contract underlying these claims is the Junction Agreement, the plaintiff's final claim "touch[es] matters" covered by the Junction Agreement and are covered by the Agreement's arbitration provisions. Moreover, to the extent that the plaintiff's claim hinges on the parties' joint provision of transportation services to third party customers—the subject matter of the Junction Agreement—the plaintiff's claim is covered by that Agreement's arbitration provisions.

■ However, plaintiff NYCH's remaining claim that Conrail breached the 1976 and 1993 leases of Greenville Yard does not appear to "touch matters" covered by the Junction Agreement. Reached prior to the Junction Agreement by Conrail and NYCH's predecessor in interest, the 1976 lease contains no arbitration provisions; nor did Conrail and NYCH add an arbitration clause when the two parties expressly committed themselves to the lease after NYCH's acquisition of New York Dock Railroad in 1983. *See* Def.Exhs. 2 & 3. Similarly, the 1993 lease does not include any provision requiring arbitration. *See* Def.Exh. B. The alleged breach of lease does not represent any violation of the Junction Agreement. Indeed, the leases do not relate to the two parties' relationship as joint providers of transportation services, but rather result from Conrail's ownership of a docking facility essential to plaintiff's business.[9] As a result, plaintiff's breach of lease claim is not subject to the arbitration clause of the Junction Agreement. For the same reasons, to the extent that plaintiff's tortious breach of contract and breach of an implied covenant of good faith claims arise from the breach of the 1976 or 1993 Greenville Yard leases and are unrelated to the Junction Agreement, those claims are not subject to arbitration.[10]

### C. Arbitration of Federal Statutory Claims

■ In determining whether to compel arbitration of plaintiff's claims, the court must address the arbitrability of the plaintiff's allegations of federal anti-trust viola-

9. Given the close nature of the business relationship between NYCH and Conrail, the breach of lease *could* indirectly "touch matters" governed by the Junction Agreement by undermining NYCH's ability to provide services to joint customers. However, any "touching" of that nature is too tangential to bring the lease under the Junction Agreement's arbitration clause. A contrary holding would subject *any* claim brought by this plaintiff against this defendant to arbitration.

10. It would appear from the plaintiff's damages request that the greater part of the tortious breach of contract and breach of cove-

nant of good faith claims do not relate to the Greenville Yard leases, but rather to the Junction Agreement. Where NYCH demands only $ 1 million compensatory damages for the breach of lease, it demands $100 million in compensatory damages for the tortious breach of contract and breach of covenant of good faith claims. *See* Amend. Complaint, Demand for Judgment. At the very least, the large difference in size between the demands for compensatory damages suggests that the breach of lease is not the sole contract underlying the latter claims.

tions. Until relatively recently, courts including the Second Circuit had held anti-trust violations to be non-arbitrable. *See, e.g., American Safety Equipment Corp. v. J.P. Maguire & Co.*, 391 F.2d 821 (2d Cir.1968). However, in *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), the Supreme Court overruled *American Safety*, at least in part, and compelled arbitration of anti-trust claims in the context of an international commercial transaction. *See id.* at 628–29, 105 S.Ct. 3346. While the *Mitsubishi* Court carefully declined to address the viability of the *American Safety* doctrine as it applied to anti-trust claims resulting from domestic transactions, *see id.* at 629, 105 S.Ct. 3346, lower courts, including this one, have consistently interpreted the *Mitsubishi* holding expansively and have consequently subjected anti-trust claims arising from domestic transactions to arbitration. *See Kotam Electronics, Inc. v. JBL Consumer Products, Inc.*, 93 F.3d 724, 727–28 (11th Cir.1996), *cert. denied*, 519 U.S. 1110, 117 S.Ct. 946, 136 L.Ed.2d 835 (1997); *Nghiem v. NEC Electronic, Inc.*, 25 F.3d 1437, 1441–42 (9th Cir.1994); *DJ Manufacturing Corp. v. Tex–Shield, Inc.*, 998 F.Supp. 140, 145 (D.P.R.1998); *Acquaire v. Canada Dry Bottling*, 906 F.Supp. 819, 837 (E.D.N.Y.1995). In addition, the Second Circuit has affirmed, without opinion, a district court holding that "the reasoning of *Mitsubishi* should apply with equal force to domestic claims." *Hough v. Merrill Lynch*, 757 F.Supp. 283, 286 (S.D.N.Y.), *aff'd without op.*, 946 F.2d 883 (2d Cir.1991). As a result, this court agrees with the reasoning and holdings of this recent case law and thus holds the plaintiff's anti-trust claim to be subject to arbitration.

### D. Stay of Plaintiff's Breach of Lease Claim

■ Finally, the court must address whether to allow plaintiff to continue to prosecute its non-arbitrable claims or to stay the proceedings pending arbitration of the plaintiff's arbitrable claims. "The decision to stay the balance of the proceedings pending arbitration is a matter largely within the district court's discretion to control its docket." *Genesco*, 815 F.2d at 856 (citing *Moses H. Cone*, 460 U.S. at 20 n. 23, 103 S.Ct. 927). Such a stay is "particularly appropriate if the arbitrable claims predominate the lawsuit and the non-arbitrable claims are of questionable merit." *Id.* at 856.

■ In the case at hand, the arbitrable claims clearly predominate the action. For example, as damages for the non-arbitrable claim of breach of lease, the plaintiff has demanded $ 1 million; meanwhile, for its arbitrable anti-trust and breach of fiduciary duty claims, the plaintiff has demanded $ 100 million in compensatory damages for each claim, as well as additional punitive and treble damages. *See* Amend. Complaint, Demand for Judgment. As for the tortious breach of contract and breach of covenant of good faith claims, while the plaintiff has demanded $100 million in compensatory damages, as well as additional punitive damages, it appears that a substantial portion of that demand arises from breach of the Junction Agreement, rather than breach of lease, and that portion is arbitrable. *See supra* note 10. Resolution of the arbitrable claims will thus go a long way towards resolving this action and may place the parties "in a position productive of settlement." *Heller v. MC Financial Services Ltd.*, 1998 WL 190288, at *4 (S.D.N.Y. 1998).

Moreover, in arbitrating the anti-trust claim, the parties will have to address the plaintiff's allegations that Conrail coerced the plaintiff into accepting the 1993 lease and breached the 1976 and 1993 leases in order to put the plaintiff out of business. *See* Amend. Complaint ¶¶ 73–85, 91–101. As a result, the arbitrator will likely develop the facts and circumstances surrounding the alleged breach of lease. Factual development will ease this court's task and

promote judicial economy. *See Acquaire,* 906 F.Supp. at 838 (identifying judicial economy as factor in discretionary decision to stay resolution of non-arbitrable claims pending arbitration).

Finally, requiring the parties to arbitrate before resolution of the breach of lease claim will not result in undue hardship for the plaintiff. Though in its amended complaint NYCH alleged that Conrail's rescission of the 1993 lease was ongoing, threatened the survival of the company, and warranted injunctive relief, NYCH did not apply for a temporary restraining order or a preliminary injunction. When defendant Conrail responded that no rescission had taken place and the lease was still in effect, *see* Def.Memo at 6 n. 6, plaintiff NYCH did not bother to reply. *See* Pl.Memo. in Opp. Moreover, one of the virtues of arbitration is its expedited format. *See Dean Witter Reynolds,* 470 U.S. at 220, 105 S.Ct. 1238. As a result, there is no reason to believe that staying the breach of lease claims pending arbitration would cause the plaintiff undue hardship. However, the court invites plaintiff to submit a motion to reconsider the stay, should the plaintiff be able to amply demonstrate undue hardship.

## III. Primary Jurisdiction

The defendant has also moved the court to refer aspects of this case to the Surface Transportation Board and stay the action pending the STB's decision, under the doctrine of primary jurisdiction. The plaintiff opposes this motion.

■■■■ "The doctrine of primary jurisdiction 'is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.'" *Nader v. Allegheny Airlines,* 426 U.S. 290, 303, 96 S.Ct.

1978, 48 L.Ed.2d 643 (1976) (quoting *United States v. Western Pac. R.R. Co.,* 352 U.S. 59, 63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)). Despite its name, the doctrine is not jurisdictional, *see Baltimore & Ohio Chicago Terminal R.R. Co. v. Wisconsin Central Ltd.,* 154 F.3d 404, 1998 WL 531357, at *8 (7th Cir.1998), but rather applies "where a claim is originally cognizable in the courts [but] ... requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body ...." *Western Pac. R.R.,* 352 U.S. at 64, 77 S.Ct. 161. Even if the administrative agency lacks the authority to resolve the legal claims presented, a court may refer specific issues presented by those claims to that agency under the doctrine of primary jurisdiction if referral would "secure uniformity and consistency in the regulation of business entrusted to that agency," *Allegheny Airlines,* 426 U.S. at 303–04, 96 S.Ct. 1978, or would "prove helpful to the court in resolving difficult factual issues." *Johnson v. Nyack Hospital,* 964 F.2d 116, 122 (2d Cir.1992) (citing *Allegheny Airlines,* 426 U.S. at 304, 96 S.Ct. 1978). In such a case, the court should stay, rather than dismiss, the action pending the agency's determination of the specific referred issues. *See Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 305–307, 93 S.Ct. 573, 34 L.Ed.2d 525; *Engelhardt v. Consol. Rail Corp.,* 756 F.2d 1368, 1369 (2d Cir.1985).

■■■■ In this case, Conrail argues that the allegations of discriminatory rates and fraudulent misrouting that underlie NYCH's anti-trust claim are questions within the special competence of the STB.[11] *See* Pl.Memo. at 19–20. In addition, Conrail argues that the plaintiff's fiduciary duty claim raises an important state law question—whether railroads pro-

---

11. Statutes and case law appear to support this contention. *See* 49 U.S.C. §§ 10701, 10741, 10747; *New York v. United States,* 600 F.2d 349, 351 (2d Cir.1979) (holding determination of whether rates are discriminatory to have been committed to ICC, predecessor to STB) (citing *United States v. Chicago Heights Trucking Co.,* 310 U.S. 344, 60 S.Ct. 931, 84 L.Ed. 1243 (1940)); *Providence & Worcester R.R. Co. v. United States,* 666 F.2d 736, 742–43 (1st Cir.1981) (exercising deferential review of ICC decision on misrouting).

viding joint services to customers owe each other a fiduciary duty—which could affect the uniformity of the STB's administration of the Interstate Commerce Commission Termination Act. *See id.* at 21–22. As a result, Conrail requests that the court stay resolution of the anti-trust and fiduciary duty claims pending STB analysis of these questions.

Whether or not to refer questions such as these to the STB requires a case-by-case analysis. *See Delaware & Hudson Railway Co. v. Consol. Rail Corp.,* 654 F.Supp. 1195, 1200 (N.D.N.Y.1987); *Engelhardt v. Consol. Rail Corp.,* 594 F.Supp. 1157, 1164 (N.D.N.Y.1984), *aff'd,* 756 F.2d 1368 (2d Cir.1985). Courts have considered such factors as how much aid the agency's decision would render and how substantial a delay agency review would cause. *See Delaware & Hudson Railway,* 654 F.Supp. at 1203. Were this court addressing the merits of the plaintiff's claims in this case, the court would carefully weigh the various factors in order to decide whether to refer the case under the doctrine of primary jurisdiction.

However, this court can not address the merits of this case. Where a court refers a case to mandatory arbitration, that court "is not to rule on the potential merits of the underlying claims." *AT & T Technologies,* 475 U.S. at 649, 106 S.Ct. 1415. Indeed, as stated above, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that the district court shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). As a result, having decided that the anti-trust and fiduciary duty claims must be decided by an arbitra-

tor, this court lacks the authority to make the discretionary decision whether those claims require preliminary referral to the STB.

This is not to say that the defendant is foreclosed from framing its primary jurisdiction arguments to the arbitrator. To the contrary, the doctrine of primary jurisdiction applies to arbitrators as well as courts. *See Baltimore & Ohio Chicago Terminal R.R. Co.,* 154 F.3d 404 (7th Cir. 1998), at *6. As a result, unless the defendant withdraws its primary jurisdiction argument, the arbitrator should address the argument as a threshold consideration.[12] If the arbitrator decides that referral to the STB is warranted, (s)he should stay arbitration pending the STB's resolution of the referred issues.

CONCLUSION

For the reasons stated above, defendant's motion to compel arbitration is granted as to plaintiff's anti-trust and fiduciary duty claims in their entirety and plaintiff's claim of tortious breach of contract and breach of an implied covenant of good faith insofar as that claim relates to the Junction Agreement. The parties are directed to submit these claims to arbitration pursuant to Paragraph 8 of the Junction Agreement. All other claims and pending motions are hereby stayed pending the outcome of the arbitration.

SO ORDERED.

---

**12.** It should be noted that plaintiff's argument that the STB is needed to resolve complex factual questions and complicated legal and policy issues involving railroads may be less persuasive given the likelihood that the arbitrator appointed by the parties will be "familiar not only with the relevant statutory and common law but also with the custom and usage of the trade." *Prudential Lines,* 704 F.2d at 63. However, this does not absolve the arbitrator from carefully considering whether referral to the STB is required under the primary jurisdiction doctrine.