7. Count VIII, turnover of estate property, is **DISMISSED**.

In re **WINSTAR COMMUNICATIONS, INC., et al., Debtors.**

**Christine C. Shubert, as Chapter 7 Trustee of the Debtors' Estates, Plaintiff,**

v.

**Wellspring Media, Inc., f/k/a Regulus International Capital Co., Inc. a Delaware corporation, Defendant.**

**Bankruptcy No. 01–1430.
Adversary No. 05–50586.**

United States Bankruptcy Court, D. Delaware.

Nov. 30, 2005.

M. Blake Cleary, Edwin J. Harron, Edward J. Kosmowski, Pauline K. Morgan, Brendan Linehan Shannon, Young, Conaway, Stargatt & Taylor, LLP, William K. Harrington, Michael R. Lastowski, Duane Morris LLP, Sheldon K. Rennie, Fox Rothschild LLP, Christopher A. Ward, The Bayard Firm, Wilmington, DE, Michael G. Menkowitz, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, for Debtor Winstar Communications, Inc.

## MEMORANDUM OF OPINION AND ORDER

RANDOLPH BAXTER, Bankruptcy Judge.

Before the Court is Defendant Wellspring Media, Inc.'s ("Wellspring") Motion to Dismiss or Stay Adversary Proceeding or, in the Alternative, for a Partial Dismissal of the Amended Complaint ("Wellspring's Motion").

The Court acquires core matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a), (b) and 1334(b). Upon a duly noticed hearing, the following factual findings and conclusions of law are hereby rendered:

\*

Winstar Communications provided integrated broadband communications and information services, including local and long distance voice services, Internet connectivity, data transmission, web hosting, web design and development and other enhanced services. Winstar Communications also developed and distributed information content and provided related services through traditional media, such as television, video, cable, radio, and the Internet.

On April 18, 2001, Winstar Communications, Inc. and certain of its direct and indirect subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Code"). The Debtors continued operations as debtors in possession. On January 24, 2002, after the Debtors defaulted on their post-petition financing, this Court entered an order converting the Debtors' Chapter 11 cases to proceedings under Chapter 7 of the Code.

Winstar New Media Company, Inc. ("New Media"), a subsidiary of Winstar Communications, Inc., owned all of the outstanding stock of Winstar TV and Video, Inc. ("TVV") and the membership unit of Winstar Productions, LLC ("WSP") (collectively, the "Winstar Entities"). TVV and WSP were worldwide producers, distributors, and releasors of television and film programs. On July 19, 2001, after filing their bankruptcy petitions, the Debtors decided to sell the Winstar Entities, and entered into an Agreement and Plan of Organization[1] (the "Agreement") with Regulus (now known as Wellspring Media, Inc.).[2]

---

1. Exhibit A to Trustee's Amended Complaint.

2. At the relevant times, Wellspring was known as Regulus International Capital Co., Inc. ("Regulus").

The payment option selected by Regulus under the Agreement called for an immediate cash payment of $2,000,000, and the issuance of a promissory note in the amount of $3,000,000 (the "Note"). The Agreement called for the Note to bear 8% interest, with a $750,000 payment due on March 1, 2002, and the balance of principal and interest being due two years from the closing date.

Pursuant to the terms of the Agreement, New Media agreed that on July 31, 2001, the Winstar Entities would carry at least $3,000,000 of Working Capital, as defined by Paragraph 1.03(a) of the Agreement. Paragraph 1.03(c) sets forth the mechanism for resolving any disputes arising from the Working Capital calculation. The Agreement provides that Regulus would calculate Working Capital as of July 31, 2001, and that within ninety days of the closing of the sale, Regulus would deliver to New Media a Working Capital Statement of its calculations. Upon receipt of the Working Capital Statement, New Media would have fifteen business days to make an objection. Regulus and New Media would then have an additional period of fifteen days to resolve any objections. If that period lapsed without resolution, New Media had the right to employ a certified public accountant to audit the books of the Winstar Entities (the "Auditor's Report"). Paragraph 1.03(c) of the Agreement then provided that,

> If, after fifteen (15) business days after both parties' receipt of the Auditor's report, the parties are still unable to resolve the dispute, either party may elect to commence arbitration before a single, mutually approved arbitrator, under the rules and administration of the American Arbitration Association in New York, New York.

If the Working Capital on the proscribed date was ultimately determined to be an amount less than $3,000,000, Paragraph 1.03(b) states that Regulus' sole remedy would be to reduce the principal amount of the Final Payment of the promissory note (and then the First Payment, if necessary) by the amount of the deficiency. On August 3, 2001, this Court entered an order approving the Agreement. The transaction was closed on September 10, 2001.

On November 30, 2001, in accordance with the Agreement, Regulus sent a Working Capital Report to New Media, concluding that the Working Capital of the Winstar Entities on July 31, 2001 was a deficit of $779,929, as opposed to the surplus of $3,000,000 required by the Agreement. This Working Capital Report was received on December 3, 2001. New Media responded with a letter dated December 17, 2001, disputing the Working Capital Report's calculations.[3] Wellspring offers an affidavit from Lee Miller, Regulus' former Chairman, testifying that it never received an Auditor's Report from New Media.[4]

Wellspring did not make payments on the promissory note, asserting that the deficiency in Working Capital relieved it of its obligations under the Agreement. On March 14, 2005, Christine C. Shubert, as Chapter 7 Trustee, brought suit against Wellspring,[5] alleging: 1) breach of promissory note, 2) turnover of property of the

---

3. At oral argument, the Trustee stated the Debtors' belief that the correct Working Capital calculation was a surplus of $3,200,000.

4. Affidavit of Lee H. Miller in Support of the Motion of Wellspring, Media, Inc. to Dismiss or Stay the Adversary Proceeding or in the Alternative, for Partial Dismissal of the Amended Complaint ("Miller Affidavit").

5. Subsequent to the closing, Regulus changed its name to Wellspring. Wellspring is the named defendant in the above captioned adversary proceeding.

estate pursuant to 11 U.S.C. § 542, and 3) unjust enrichment. On July 11, 2005, the Trustee received a letter indicating Wellspring's desire to submit the matter to arbitration. Wellspring also filed the pending Motion to Dismiss or Stay pending arbitration.

\* \*

Wellspring asks the Court to order the parties to submit the dispute to arbitration, and to stay or dismiss proceedings pending arbitration. Wellspring initially argues that under Paragraph 1.03 of the Agreement, as enforced by Section 2 of the Federal Arbitration Act (FAA), the dispute is subject to mandatory arbitration, and that a contrary reading would render the provision illusory. Alternatively, even if arbitration were permissive, Wellspring argues that the Court, in its discretion, should submit this dispute to arbitration.

In the event that the Court decides not to refer the matter to arbitration, Wellspring asks the Court to dismiss Counts II and III of the Trustee's Complaint, seeking turnover of property of the estate under § 542, and unjust enrichment. Wellspring argues that the dispute does not meet the requirements of a turnover action under § 542, since a bona fide dispute exists as to the liability of the defendant to the debtor. Wellspring next argues that the Trustee cannot pursue an unjust enrichment claim when a valid, enforceable contract exists. Additionally, Wellspring claims that the Trustee has failed to establish that Wellspring has received a benefit to which New Media was entitled.

The Trustee contends that by using the word "may," instead of the words "shall" or "must," the parties intended the arbitration clause of Paragraph 1.03 to be permissive. The Trustee also points to the Court's Order approving the Agreement, in which the Court retained jurisdiction over the Purchase Agreement. The Trus-

tee asserts that arbitration would be more expensive, more time consuming, and less efficient to the Debtors. Finally, the Trustee notes that Wellspring did not seek arbitration in this matter until after the Trustee brought this suit. Therefore, it would be permissible and appropriate for the Court to exercise its discretion and to refuse to compel arbitration.

In response to Wellspring's arguments regarding its turnover claims, the Trustee believes that it should be permitted to seek turnover under § 542 of the amount due on the face of the promissory note, with the funds subject to the Working Capital dispute addressed as a separate asset subject to a right of setoff. Finally, the Trustee asserts that a claim for unjust enrichment is an alternative basis for relief, which is permitted by Rule 8(e)(2) of the Federal Rules of Civil Procedure.

Wellspring replies to the Trustee's arguments by noting that a pre-suit demand for arbitration is unnecessary for a court to compel parties to arbitration, and that imposing such a requirement would place the unusual burden upon the party to be charged of instituting proceedings to establish his own liability. Wellspring notes that the reason that it has asked to submit the matter for this arbitration at this late date is because Paragraph 1.03 provides for arbitration only after receipt of the Auditor's Report, which in this case was allegedly never requested.

\* \* \*

■ Before proceeding to the merits of the allegations contained in the Trustee's complaint and Wellspring's motion to dismiss these counts, the Court examines whether proceedings should be stayed in order for the matter to be resolved in arbitration. In making this determination, the Court conducts a three-step analysis: 1) whether the dispute is governed by an

enforceable arbitration clause, 2) whether the Court has discretion to deny the enforcement of the arbitration clause (i.e., whether the issue is core or non-core), and 3) whether the Court should exercise its discretion to deny arbitration. *See generally Videsh Sanchar Nigam Limited v. Startec Global Comm. Corp.,* 300 B.R. 244, 250 (D.Md.2003).

### 1. Whether the dispute is subject to an enforceable arbitration clause

■■■ It is evident that the Agreement, which involves an agreement between a Connecticut corporation and a Delaware corporation for the acquisition of a New York corporation and a Delaware limited liability company, is a "transaction involving commerce," and therefore falls within the scope of § 2 of the Federal Arbitration Act (FAA). Section 2 of the FAA provides that

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. "The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). "When determining both the existence and the scope of an arbitration agreement, there is a presumption in favor of arbitrability. '[A]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' " *Trippe Mfg. Co. v. Niles Audio Corp.,* 401 F.3d 529, 532 (3d Cir.2005) (quoting *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)). "Accordingly, there is a strong presumption in favor of arbitration and a party seeking to invalidate an arbitration agreement bears the burden of establishing its invalidity." *Carter v. Countrywide Credit Industries, Inc.,* 362 F.3d 294, 297 (5th Cir.2004) (citing *Gilmer v. Interstate / Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991)).

■ The arbitration clause in question unambiguously applies to the precise question at hand, the determination of the amount of Working Capital held by the Winstar Entities on July 31, 2001. The Trustee does not dispute that the Agreement was the product of arms length dealings between the parties. *Yardis Corp. v. Silver,* 2005 WL 2405970, *4 (E.D.Pa.2005) ("Whenever possible, arbitration awards should be construed to uphold their validity because a contrary course would result in the substitution of the judgment of the court for the judgment of the arbitrators chosen by the parties and that would make the award itself the beginning, not the end, of litigation."). The Trustee "stands in the shoes of the debtor for purposes of the arbitration clause and that the Trustee-plaintiff is bound by the clause to the same extent as would be the debtor." *Matter of Esco Mfg., Co.,* 33 F.3d 509, 514 (5th Cir. 1994) (citing *Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149, 1154–62 (3rd Cir.1989)).

■ The Trustee argues, however, that by using the term "may," instead of terms such as "shall" or "must," the provision cannot be interpreted as mandating arbitration. This argument was specifically dismissed by the Southern District of New York, which determined:

Instead, the proper interpretation is that the arbitration provision did not have to be invoked, but once raised by one party, it became mandatory with respect to the other party. A plain reading of the clause supports such an interpretation. If the clause were wholly optional, as defendants contend, it would serve no purpose. Parties can always submit disputes to arbitration if they both agree to do so, therefore, there would be no reason to include such a provision. It follows that the word 'may' was used to mandate arbitration at the insistence of any one party to the agreement, but to indicate that arbitration was not mandatory absent the invocation of the provision by one of the parties.

*Chiarella v. Vetta Sports, Inc.*, 1994 WL 557114, *3 (S.D.N.Y.1994); *see also Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 204 n. 1, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985) ("The use of the permissive 'may' is not sufficient to overcome the presumption that parties are not free to avoid the contract's arbitration procedures."); *United Steelworkers of America, AFL–CIO v. Fort Pitt Steel Casting, Division of Conval–Penn, Inc., Division of Conval Corp.*, 598 F.2d 1273, 1279 n. 18 (3d Cir.1979) (holding that the district court did not commit plain error by finding that "grievance procedures are mandatory despite language in the collective bargaining agreement that the parties 'may' invoke those procedures.") (citations omitted).

By using the word "may," both parties were given the power to enforce the arbitration clause. *Deaton Truck Line, Inc. v. Local Union 612, Affiliated with Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 314 F.2d 418, 422 (5th Cir.1962) ("Clearly, however, 'may' should be construed to give either aggrieved party the option to require arbitration."). The word "may," therefore, cannot reasonably imply that either party had the option to avoid arbitration once that clause had been triggered. *Block 175 Corp. v. Fairmont Hotel Management Co.*, 648 F.Supp. 450, 452 (D.Colo. 1986) ("Plaintiff contends the presence of the word 'may' in the arbitration clause renders arbitration permissive and not mandatory. A common sense reading of the clause belies this contention. When either party elects to arbitrate and serves the proper notice, as was done here, then arbitration must ensue.").

■ The Trustee further argues that language in the Court's Sale Order "evinces the parties' intention that either party need not first seek arbitration prior to commencing an action in this Court." [6] The Trustee correctly asserts that the Court retained jurisdiction to compel payment of the purchase price. The Trustee seemingly views this matter as being comprised of two separate issues, including "whether Defendant is entitled to any set off based on the Working Capital calculation and whether Defendant breached the Agreement and Promissory Note." [7] Under this reasoning, the calculation of Working Capital would operate only as a set-off to be applied against the amount due on the face of the Note.[8] The Trustee's characterization, however, ignores the fact that the Agreement itself intertwines the amount of

---

**6.** Trustee's Opposition, at 9.

**7.** *Id.* at 12.

**8.** *Id.* at 9.

Working Capital with the amount due on the Note, stating that "[i]f the Working Capital is less than $3,000,000, the Company's sole remedy will be to reduce the principal amount first of the Final Payment (as defined in the Promissory Note) and then of the First Payment (as defined in the Promissory Note) of the Promissory Note by the difference between $3,000,000 and the Working Capital." [9] Under the terms of the agreement, the Court cannot compel payment of the purchase price without a determination of what Wellspring owes on the Note. The Agreement merely provides for an agreed-upon mechanism to resolve this dispute. Once the proper amount is resolved, the Court unquestionably has the power to enforce payment pursuant to the Agreement.

The Trustee has not presented any evidence to support its assertion that the parties "by no means intended to require arbitration." [10] The parties expressly created an ability to submit the matter for arbitration. There is nothing in the Agreement to indicate that the mutual consent of the parties was necessary to seek arbitration. *New York Cross Harbor R.R. Terminal Corp. v. Consolidated Rail Corp.*, 72 F.Supp.2d 70, 77 (E.D.N.Y.1998) (distinguishing *Gangemi v. General Elec. Co.*, 532 F.2d 861 (2d Cir.1976)) (recognizing that an arbitration clause containing the word "may" could be permissive where arbitration required mutual consent of the parties). Therefore, the Trustee has not produced evidence to rebut the language creating an enforceable arbitration agreement. *Ceres Marine Terminals, Inc. v. International Longshoremen's Ass'n, Local 1969*, AFL–CIO 683 F.2d 242, 248 (7th Cir.1982) ("Even if the scales of plausibility tipped the other way, the principle that doubts must be resolved in favor of arbi-

tration would lead us to conclude that the district court correctly determined the Agreement did not give [the party opposing arbitration] a choice between arbitration of its grievance and the immediate filing of a civil action for damages in the courts.").

## 2. *Whether the Court has discretion to deny enforcement of the arbitration clause*

Even, however, if the arbitration clause is applicable to the issue at hand, the Court may still have discretion to deny the enforcement of the arbitration clause. The determination of whether the bankruptcy court has discretion to deny enforcement of an arbitration clause rests on whether the proceeding is core or non-core. *E.g., In re Startec*, 300 B.R. at 252. "While it is clear that bankruptcy courts do not possess discretion with respect to enforcement of an arbitration clause in a non-core adversary proceeding, it does appear manifest that such discretion exists with respect to core adversary proceedings." *In re Oakwood Homes Corp.*, 2005 WL 670310, *3 (Bankr.D.Del.2005). When exercising this discretion in core proceedings, the Court "must carefully determine whether any underlying purpose of the Bankruptcy Code would be adversely affected by enforcing an arbitration clause and ... should enforce such clause unless that effect would seriously jeopardize the objectives of the [Bankruptcy] Code." *In re American Classic Voyages, Co.*, 298 B.R. 222, 226 (D.Del.2003) (quoting *Hays*, 885 F.2d at 1161); *In re Mintze*, 2003 WL 22701020, *3 (E.D.Pa.2003) (In a core proceeding, the "bankruptcy court may properly deny enforcement if the arbitration would have a significant adverse impact on

---

**9.** Agreement, at ¶ 1.03(b).

**10.** Trustee's Opposition, at 8.

the administration of the bankruptcy case.").

Wellspring does not appear to dispute that this matter is a core proceeding. This adversary proceeding arises from a post-petition agreement to sell assets of the debtor-in-possession. It is well settled in this circuit that such an action is a core proceeding. *E.g., Northwestern Institute of Psychiatry, Inc. v. Travelers Indem. Co.,* 272 B.R. 104, 108 (E.D.Pa.2001) ("Therefore, the adversary action involves a post-petition contract with a debtor-in-possession, and such an action is categorized as core under 28 U.S.C. §§ 157(b)(2)(A), 'matters concerning the administration of the estate,' and section (b)(2)(O) 'other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor relationship.' "); *In re LaRoche Industries, Inc.,* 312 B.R. 249, 253 (Bankr.D.Del.2004); *In re Coram Healthcare Corp.,* 2003 WL 22948234, *3 (Bankr.D.Del.2003) ("The adversary proceeding involves post-petition contract claims of the trustee and arises in the Debtors' bankruptcy case. The Trustee's post-petition breach of contract claims are core proceedings.") (citations omitted); *In re Porter,* 295 B.R. 529, 536 n. 3 (Bankr.E.D.Pa.2003) ("Contracts entered into with a bankruptcy fiduciary—a trustee or debtor in possession—are 'integral to the estate administration from the date they are entered into' and so 'arises in' those bankruptcy cases.").

### 3. *Whether the Court should exercise its discretion and decline to compel arbitration*

Since this matter is a core proceeding, the Court may decline to compel arbitration, but only if it finds that enforcement of the arbitration clause would conflict with the policies of the Bankruptcy Code, or where the dispute underlying the arbitration is based on rights created by the Bankruptcy Code. *In re Slipped Disc Inc.,* 245 B.R. 342, 344 (Bankr.N.D.Iowa 2000) ("If conflicts exist between the Bankruptcy Code and the Federal Arbitration Act, mandatory enforcement of arbitration agreements becomes discretionary in bankruptcy."); *In re Barney's, Inc.,* 206 B.R. 336, 343 (Bankr.S.D.N.Y.1997) (citing *Dean Witter Reynolds v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985)) ("Even assuming, arguendo, that the arbitration provisions could be construed to encompass the issues raised either in this litigation or by defendants in the arbitration counterclaim, we would not compel the matter to be resolved in the pending arbitration. The strong federal policy favoring rigorous enforcement of arbitration clauses may be overridden 'by a countervailing policy manifested in another federal statute.' The Bankruptcy Code is such a federal statute."); *In re Mintze,* 2003 WL 22701020, *3 (E.D.Pa.2003).

When determining whether an otherwise enforceable arbitration clause should be enforced, "a bankruptcy court retains significant discretion to assess whether arbitration would be consistent with the purpose of the Code, including the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders." *In re Startec,* 292 B.R. at 253 (citing *In re National Gypsum,* 118 F.3d 1056 (5th Cir.1997)). The Court may also consider factors such as: "(1) Whether the issue can be resolved more expeditiously by the bankruptcy judge as opposed to through the arbitration process; (2) Whether or not special expertise is necessary in deciding the issue; (3) The impact on creditors of the debtor who were never parties to the agreement containing the

arbitration clause; and (4) Whether arbitration threatens the assets of the estate." *In re Slipped Disc*, 245 B.R. 342, 345 (Bankr.N.D.Iowa 2000); *In re Dunes Hotel Associates*, 194 B.R. 967, 993 (Bankr. D.S.C.1995).

The Trustee advances three arguments for why the Court should exercise its discretion to decline to enforce the arbitration clause. First, the Trustee argues that the Debtors would be forced to litigate in two separate forums. Second, the Trustee alleges that there would be "significant expense involved in litigating this issue in New York before an arbitrator, not to mention the burden on the Trustee and her professionals to appear in New York." [11] Third, the Trustee implies that Wellspring should be barred from enforcing the arbitration clause, since it did not seek to submit the matter to arbitration until after the Trustee commenced the pending adversary proceeding.

The Trustee first argues that enforcement of the arbitration clause would conflict with one of the "essential purposes of the Bankruptcy Code, which is to provide for one forum the bankruptcy court, to determine all issues regarding property of the estate." [12] In this case, there is only one issue, the proper calculation of Working Capital. The issue before the Court does not involve a number of core proceedings that were "premised on provisions of the Bankruptcy Code," and where the Court is asked to enforce arbitration of "only some of these closely related claims." *In re Startec*, 300 B.R. at 254 (finding that given the complexity of the facts and the estate's interest in the disputed amounts due, the bankruptcy court did not abuse its discretion in finding that the "best interests of the estate will be served by litiga-

tion of all claims before this court so as to provide one forum to determine all issues.").

The Trustee states that if the arbitration clause is enforced "Plaintiff would be required to arbitrate the narrow issue of Working Capital and then return to the bankruptcy court to compel payment of the purchase price." [13] That scenario, however, is the exact procedure contemplated by the parties to the Agreement. The Trustee cannot now use this alternate forum as a reason to circumvent the agreed-upon dispute resolution procedures.

In any event, the need to return to this Court after arbitration to compel payment of the purchase price is speculative and unsupported by Wellspring's position in this proceeding. Wellspring does not contest the terms or binding effect of the Agreement. Presumably, Wellspring does not dispute that it owes a purchase price, which includes the amount due on the Note, with proper adjustments made for any amount that the ultimate Working Capital amount is less than $3,000,000. Wellspring only asserts that the amount that it owes on the note, after adjusting for what it believes to be a Working Capital deficiency, is zero. Therefore, assuming that Wellspring is willing to abide by the outcome of the arbitration, the Trustee's pending adversary complaint would be rendered moot, as would the alleged hardship of litigating in two forums.

■ The Trustee is correct in asserting that the Court could resolve the dispute regarding the Working Capital calculation. The Debtors, however, in agreeing to the arbitration clause, determined that arbitration, and not this Court, would be

---

**11.** Trustee's Opposition, at 13.

**12.** *Id.* at 12.

**13.** *Id.*

the avenue through which this issue should be addressed. Absent evidence that arbitration would jeopardize the objectives of the Bankruptcy Code, the Court gives deference to the procedures agreed upon by the parties for resolving this dispute. *See Hays,* 885 F.2d at 1162 n. 23 (citing *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 519, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)) ("An agreement to arbitrate before a specific tribunal is, in effect, a specialized kind of forum selection clause. Moreover, based on the recent Supreme Court arbitration cases we have previously reviewed, the national policy favoring enforcement of agreements to arbitrate is at least as strong or stronger than that favoring enforcement of forum selection agreements.").

■ At the time of the Agreement, the Debtors presumably understood the costs and benefits of submitting the Working Calculation to arbitration. The Trustee cannot now attempt to avoid the forum designated by the Debtors and Regulus to resolve this specific dispute by making unsupported allegations of excessive costs. *Thyssen, Inc. v. Calypso Shipping Corp., S.A.,* 310 F.3d 102, 105 (2d Cir.2002) ("Absent evidence of excessive cost, the presumption in favor of arbitration cannot be overcome merely on the basis of the length of the delay."). It is difficult to imagine that the costs involved in litigating this issue would be significantly greater in arbitration in New York, as opposed to in proceedings in this Court in Delaware. In any event, the Trustee has not made any attempt to quantify such costs, and therefore has certainly not met her burden of establishing this proposition. In fact, there is persuasive authority to suggest that, absent evidence to the contrary, arbitration will often be less expensive and more efficient than proceedings in this Court. *In re GWI, Inc.,* 269 B.R. 114,

118–19 (Bankr.D.Del.2001) (quoting *Rudolph v. Alamo Rent A Car,* 952 F.Supp. 311, 317 (E.D.Va.1997)) ("the presumption in favor of arbitration is not a mindless mantra repeated merely for the sake of consistency; instead, the presumption reflects courts' acknowledgment that the arbitral process often exceeds the judicial process in speed, efficiency, and inexpense [sic]"); *Johnson v. Pfizer, Inc.,* 2004 WL 2898076, *3 n. 2 (D.Kan.2004) ("One of the reasons arbitration is favored is the presumption that arbitration (and other contractual ADR procedures) will resolve disputes more quickly and at less expense to the parties than litigation in court."). Even if such costs could conceivably be higher, this possibility alone does not establish "the sort of substantive unfairness that would be necessary to overcome the strong federal policy and presumption in favor of arbitration." *Ritch v. Eaton,* 2002 WL 32107628, *4 (E.D.Pa.2002).

■ The Trustee also implies that, since Wellspring did not seek arbitration until after the Trustee commenced this adversary proceeding, Wellspring, in essence, waived the option to have the matter determined at arbitration. "The Third Circuit has established that 'prejudice is the touchstone for determining whether the right to arbitrate has been waived.' The party trying to avoid arbitration has the burden of establishing prejudice." *In re Fleming Companies, Inc.,* 325 B.R. 687, 691 (Bankr.D.Del.2005) (quoting *Hoxworth v. Blinder, Robinson & Co.,* 980 F.2d 912, 925 (3d Cir.1992)).

To this point, it appears that Wellspring had followed the procedures set forth in the Agreement. Section 1.03 of the Agreement sets forth an explicit procedure for the resolution of any disputes concerning the Working Capital calculations. This procedure gives Wellspring the option of commencing arbitration only "after fifteen

(15) business days after both parties' receipt of the Auditor's report." [14] There is no evidence that such an Auditor's Report was conducted or received by Wellspring. Wellspring was not obligated to seek arbitration upon learning that New Media believed that the Working Capital amount was actually higher than Wellspring believed. *General Guaranty Ins. Co. v. New Orleans General Agency, Inc.*, 427 F.2d 924, 928 (5th Cir.1970) ("Requiring pre-suit demand will place on the party sought to be charged the duty to institute proceedings which may establish his own liability, though if he remains inactive the claims asserted against him may never be formally pressed in either arbitration or court proceedings (and in some instances may be wholly without merit).").

The Agreement specifically gave New Media the ability to seek an Audit Report. The Trustee cannot now allege that Wellspring waived its right to seek arbitration, since New Media's failure to provide an Audit Report denied Wellspring the ability to exercise such right. *See, e.g., Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 638 (7th Cir.2002) ("a party cannot avoid arbitration because of the other party's failure to comply with the negotiation steps of a grievance procedure as long as that other party acted in good faith to preserve its right to arbitration."). The Trustee's actions, taken outside of the mandatory arbitration procedures, cannot be used to cutoff Wellspring's power to invoke the arbitration mechanism in the agreement.

The Fifth Circuit, when faced with a similar situation, held that

"While the mere failure to assert the right of arbitration does not alone translate into a waiver of that right ... such failure does bear on the question of prejudice, and may, along with other considerations, require a court to conclude that waiver has occurred." Balancing all the considerations, plaintiffs simply have not presented enough evidence that [the defendant]'s delay materially prejudiced them. Because "waiver of an arbitration right will not be lightly inferred without some showing of prejudice," plaintiffs' failure to bring forth more than generalized protestations about the costs of delay are insufficient to overcome the strong federal presumption in favor of arbitration.

We recognize that [the defendant] simply may be requesting arbitration so that it might further delay these proceedings. In *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985), however, the Supreme Court expressly "reject[ed] the suggestion that the overriding goal of the Arbitration Act was to promote the expeditious resolution of claims.... [P]assage of the Act was motivated, first and foremost, by a congressional desire to enforce agreements into which parties had entered."

*Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 578 (5th Cir.1991) (citations omitted).

This is not a situation involving several contracts, as presented to the court in *In re APF Co.*, 264 B.R. 344, 364 (Bankr. D.Del.2001), which was cited by the Trustee at oral argument. The *APF* court declined to enforce an arbitration clause between the parties, holding that the strong federal policy favoring arbitration was outweighed by the costs of litigating in separate forums, and that "particularly in a case such as this, where the parties have not commenced or requested arbitration outside of bankruptcy, this court is the most efficient and effective forum in which

---

**14.** Agreement, at 1.03(c).

to resolve these fundamental Bankruptcy Code issues." *Id.* The court noted that

> It is one thing to force a trustee who has voluntarily commenced suit against a third party for the benefit of the estate on a claim inherited from the debtor to abide by the forum selection terms of the contract he is attempting to enforce. It is quite a different matter, however, to permit various creditors to bypass carefully established procedures ... to force an unwilling debtor to litigate a number of actions in a number of forums merely because those creditors' contracts happen to include a standard arbitration clause. In such a world, the mere cost of defending these various suits could deplete the corpus of substantial funds.

*Id.* This case appears to resemble the first scenario cited by the *APF* court (in which a trustee is forced to abide the forum selection terms agreed upon by the debtor) more than the latter, in which case the court declined to compel arbitration. In this case, it is the Trustee, and not Wellspring, who seeks to bypass the procedures set forth in the Agreement. The *APF* court also noted that several contracts were involved, some of which did not include arbitration clauses. In this case, there is one sole, narrowly defined issue, which was specifically addressed by the arbitration clause contained in the Agreement. Therefore, even if this Court *could,* in its discretion, decline to compel arbitration, the Trustee has not provided any evidence to show that the Court *should* exercise such discretion in this case.

\* \* \* \*

■ Pursuant to Section 3 of the FAA: [i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

Therefore, the above styled adversary proceeding should be stayed, pending the determination, in arbitration, of the amount of Working Capital held by the Winstar Entities on July 31, 2001.

\* \* \* \* \*

For the foregoing reasons, the Court holds that the arbitration agreement between Wellspring and New Media should be enforced. Accordingly, the defendant's motion to stay the adversary proceeding pending arbitration is hereby GRANTED. Each party is to bear its respective costs.

**IT IS SO ORDERED.**

### *JUDGMENT*

In Delaware, in said District, on this *30th* day of November, 2005.

A Memorandum Of Opinion And Order having been rendered by this Court in this matter.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Movant's motion to stay the above styled adversary proceeding pending arbitration is hereby granted. Each party is to bear its respective costs.

**IT IS SO ORDERED.**