In the Matter of the Arbitration between **Thomas C. GANGEMI, as President of the Syracuse Draftsmen's Association, Appellee,**

and

**GENERAL ELECTRIC COMPANY, Appellant.**

No. 571, Docket 75–7555.

United States Court of Appeals, Second Circuit.

Argued Dec. 10, 1975.

Decided March 29, 1976.

Jules L. Smith, Syracuse, N. Y. (Charles E. Blitman, Blitman & King, Syracuse, N. Y., of counsel), for appellee.

Francis D. Price, Syracuse, N. Y. (Lawrence L. Tully, Bond, Schoeneck & King, Syracuse, N. Y., of counsel), for appellant.

Before OAKES, VAN GRAAFEILAND, and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal by the General Electric Company ("Company") from an order of the United States District Court for the Northern District of New York, the Honorable James T. Foley, Chief Judge, which order compelled the Company to arbitrate a labor dispute arising under its collective bargaining agreement with the Syracuse Draftsmen's Association ("Union").

The dispute arose on November 1, 1974 when the Company issued 32 lack of work notices and 33 displacement notices, effective November 15, 1974, to employee members of the Union. Generally, the collective bargaining agreement then in effect between the Company and the Union provided that if certain specified conditions were met those employees who had received displacement notices had the right to "bump" or displace employees with less seniority. Shortly after issuance of the notices, the Union commenced an action in the New York State Supreme Court to obtain a temporary restraining order preventing the Company from effecting the layoffs signalled by the notices. The Union contended that the notices violated the contract because the junior workers displaced by those senior workers who had decided to exercise their "bumping" options would not be afforded the two week notice of layoff required by the contract. It further alleged that the Company was attempting to protect the jobs of seven junior employees under the guise that those employees had unique "qualifications to perform the available work." The Union contended that these seven junior employees performed jobs that required no skills or qualifications beyond those used by ordinary draftsmen.

The New York court granted the order to show cause containing the temporary restraining order but, on November 15, 1974, vacated the temporary restraining order on the Company's motion. On November 25, 1974, the Company removed the action from the state court to the district court, asserting jurisdiction in federal court under Section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a). Thereafter, on December 16, 1974, the Company moved to dismiss the action on the ground, *inter alia*, that the Union had failed to exhaust its contractual remedies by not proceeding through the contract's grievance procedures and by not attempting to submit the dispute to arbitration. The Union opposed the motion and further sought a preliminary injunction against the layoff, claiming, by the affidavit of appellant Thomas C. Gangemi, its president, that it had no adequate remedy at law and that exhausting its contractual remedies would have been meaningless since "pursuant to Article IV of the parties' collective bargaining agreement any grievance excluding a disciplinary penalty may not proceed to arbitration unless both parties mutually agree in writing."[1] The bargaining agreement's arbitration provisions, contained in Article IV of that agreement, are set forth in their entirety in the margin.[2]

---

1. Similarly, in both the Union's verified complaint in the state court action and in another affidavit sworn to by Gangemi, he asserted that "there is no binding arbitration provision contained in the parties' collective bargaining agreement with respect to this matter."

2. ARTICLE IV
 ARBITRATION
 Any individual grievance involving the interpretation and application of a provision of this Agreement may be submitted to arbitration only after it has been properly processed in accordance with the provisions of Article III and with prior written mutual agreement of the Association and the Company as executed by their authorized representatives.
 Any individual grievance involving a disciplinary penalty (including discharge) imposed during the term of this Agreement upon an employee having more than one year of continuous service may be submitted to arbitration

by either party if it remains unsettled after having been properly and fully processed in accordance with the provisions of Article III. In any such case, the standard to be applied by an arbitrator is that any such penalty shall be imposed only for just cause. In order to arbitrate such a case, the party seeking arbitration shall deliver a written request for arbitration to the other party within 30 days after the final decision of the Company has been given to the Association at Step 3 of the grievance procedure set forth in Article III. A copy of the request shall be sent to the American Arbitration Association. Thereafter, the case will be processed in accordance with the Voluntary Labor Arbitration Rules of the American Arbitration Association as amended and then in effect.
 The award of an arbitrator upon any grievance subject to arbitration as herein provided shall be final and binding upon all parties to this Agreement, provided that no arbitrator

The district court, on February 4, 1975, denied the Union's request for a preliminary injunction, concluding that the Union had failed to meet its burden of showing a "likelihood of success, irreparable harm, or a balance of equities in its favor." The court also granted the Company's "motion to dismiss the complaint for [the Union's] failure to exhaust contractual remedies" but went beyond the Company's position, indicating quite clearly in its memorandum opinion that it felt that the collective bargaining agreement's arbitration provision required mandatory arbitration of all contractual disputes.[3]

Having met with no success in the courts, the Union returned to and apparently completed the contract grievance procedures, again meeting with no success. Consequently, the Union, framing the issues in broad terms, requested that the parties voluntarily proceed to arbitration. The Company responded by offering voluntarily to arbitrate, but only with respect to more narrowly drawn issues concerning whether or not specific individual senior employees possessed the qualifications to perform the jobs held by the seven junior employees whose jobs the Company was attempting to protect.

Apparently unsatisfied with the Company's proposal to arbitrate only with respect to the limited issues, the Union sought to compel arbitration of the more broadly framed dispute by initiating the present action in the district court on June 5, 1975. Jurisdiction in the district court was asserted under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, and the United States Arbitration Act, 9 U.S.C. § 4. In this action the Union, armed with the reasoning contained in the district court's opinion in the initial action, reversed field and maintained that the collective bargaining agreement provided for compulsory binding arbitration of the dispute. The

Company moved to dismiss the action on the ground that the agreement provided for only voluntary arbitration of any dispute between the parties that did not involve a disciplinary penalty. In support of its motion the Company introduced evidence of the parties' past collective bargaining history and even cited the Union's stance in the prior action in an attempt to demonstrate to the court that it had always been the parties' intent and common understanding that the agreement did not provide for mandatory arbitration of any disputes other than those which involved disciplinary penalties.

On September 5, 1975, the district court issued its order denying the Company's motion to dismiss the action and granting the Union's petition to compel arbitration of the dispute. It noted that in its earlier opinion it had analyzed the arbitration clause of the agreement in an attempt to "expedite the resolution of this case without the necessity of subsequent litigation." The court incorporated its earlier opinion by reference, which opinion stated that the court felt that the word "may" in the arbitration clause of the contract must be interpreted as a mandatory rather than a permissive verb and that the Union's earlier contention that the contract required "prior written mutual agreement" of the parties before arbitration was available was "too simplistic to escape the contractual obligation of arbitration." In the opinion in the present case, the district court further elaborated and stated that the "prior written mutual agreement" provision of the contract could be read "as an articulation of the principle that an *individual* grievant cannot force the parties, i. e., G.E. and the Union to arbitrate a dispute which neither wants to arbitrate." (emphasis in original). Alternatively, the court felt that the requirement "could be read to mean that compulsory arbitration can only be had aft-

shall have any authority or jurisdiction to add to, detract from, or in any way alter the provisions of this Agreement.

3. In its memorandum in support of its motion to dismiss the complaint, the Company conced-

ed that the contract's arbitration clause was "permissive" but nevertheless argued that the aggrieved party must *attempt* to exhaust its contractual remedies before bringing an action for injunctive relief in the courts.

er exhaustion of grievance procedures and the obligation that the parties come to some basic agreement on the issues, etc., in writing." In any event, the district court held that the provision's "true meaning . . . is penultimately for the arbitrator and only thereafter for a federal court." We disagree.

Initially, since the district court erroneously concluded that the interpretation of the contract and presumably the question of arbitrability of the dispute was itself "penultimately for the arbitrator," we find it necessary to repeat the well established principle of federal law that unless a collective bargaining agreement clearly manifests a contrary intent, it is for the courts, not the arbitrator, to decide whether the parties to that agreement have agreed to submit specific disputes to arbitration. *Operating Engineers v. Flair Builders, Inc.*, 406 U.S. 487, 491, 92 S.Ct. 1710, 1712, 32 L.Ed.2d 248, 252 (1972); *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241, 82 S.Ct. 1318, 1320, 8 L.Ed.2d 462, 465 (1962); *John Wiley & Sons v. Livingston*, 376 U.S. 543, 546–47, 84 S.Ct. 909, 912, 11 L.Ed.2d 898, 902, 903 (1962); *United Steelworkers v. Warrior & Gulf Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). That requirement is, of course, based upon the fact that "[n]o obligation to arbitrate a labor dispute arises solely by operation of law. The law compels a party to submit his grievance to arbitration only if he has contracted to do so." *Gateway Coal Co. v. Mine Workers*, 414 U.S. 368, 374, 94 S.Ct. 629, 635, 38 L.Ed.2d 583, 590 (1974). "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Atkinson v. Sinclair Refining Co., supra*, 370 U.S. at 241, 82 S.Ct. at 1321, 8 L.Ed.2d at 466.

Superimposed upon these traditional contract notions, however, is the clear national policy favoring resolution of labor disputes in private, extra-judicial fora.[4] In keeping with this national policy the Supreme Court expressed its now well settled preference for arbitration of labor disputes in *United Steelworkers v. Warrior & Gulf Co., supra*, 363 U.S. at 582–83, 80 S.Ct. at 1353, 4 L.Ed.2d at 1417, by presuming that a broad arbitration clause applies "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." Stated another way, the courts have held that where an agreement contains a broad arbitration clause, in order to remove a specific dispute from arbitration the language of the agreement purporting to do so must be "clear and unambiguous" or "unmistakably clear." *See, e. g., International Ass'n of Mach. & A. Wkrs. v. General Elec. Co.*, 406 F.2d 1046 (2 Cir. 1969); *International U. of E., R. & M. Wkrs. v. General Electric Co.*, 407 F.2d 253 (2 Cir. 1969), *cert. denied*, 395 U.S. 904, 89 S.Ct. 1742, 23 L.Ed.2d 217.

It is within this general framework that we must interpret the disputed arbitration clause, which provides that "any individual grievance involving the interpretation of this Agreement may be submitted to arbitration only . . . with prior mutual consent of the [Union] and the Company as executed by their authorized representatives."[5] The agreement here does not contain the "broad" or "standard" mandatory arbitration clause common to many collective bargaining agreements. *See Id.* at 256. The contract recognizes the distinction between grievances involving disciplinary penalties and the remaining grievances "involving the interpretation and application of a provision" of the agreement and pro-

4. See Sections 201(a) and 203(d) of the Labor Management Relations Act, 1947, 29 U.S.C. §§ 171(a), 173(d).

5. Both parties agree that the underlying dispute here involves the interpretation and application of a provision of their collective bargaining agreement. Similarly, there is no argument that the underlying dispute involves a disciplinary penalty of any kind. Consequently, it is clear that the arbitrability of the dispute between the parties falls within the first paragraph of the collective bargaining agreement's arbitration provision. *See supra* n. 2.

**866**

vides for entirely separate treatment for each of the two categories. No one has argued, nor do we think anyone can successfully do so, that the concededly mandatory arbitration clause involving disciplinary penalties is wide enough to embrace the present controversy.[6] If the parties agreed to submit to arbitration the remaining disputes only by consent, courts are powerless, absent such consent, to compel arbitration. *See Vaca v. Sipes,* 386 U.S. 171, 184, n. 9, 87 S.Ct. 903, 913, 17 L.Ed.2d 842, 854 (1967); *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 657–58, 85 S.Ct. 614, 618–619, 13 L.Ed.2d 580, 585–586 (1965).

The district court recognized that the requirement of "prior written mutual agreement" could be read as a "permissive" arbitration provision, and thus not binding upon the Company.[7] The court further found, however, that the "mutual agreement" provision could be read as an "articulation of the principle that an *individual* grievant cannot force the principal parties, i. e., [the Company] and the Union, to arbitrate a dispute which neither wants to arbitrate. *See Black-Clawson Co. Inc. v. International Ass'n of Mach.,* 313 F.2d 179 (2 Cir. 1962)." (emphasis in original). Such an interpretation requires an unreasonable stretching of the plain meaning of the words contained in that provision to accommodate the concededly strong policy favoring the arbitration of labor disputes. While that policy requires that a provision excluding a dispute from arbitration be "clear and unambiguous" it does not require that a court adopt an unreasonable construction of a contract provision in order to find that a dispute is arbitrable.

Article III of the parties' bargaining agreement establishes the right of an individual to initiate, without the consent or participation of the Union, a grievance at Step I of the three-step grievance procedure. If settlement of the grievance is not reached at that stage, however, the Union must take up the individual's cause in order to complete the grievance procedure through Steps II and III to completion. Even if the Union does process an individual's complaint through the final grievance step, however, there is, of course, no guarantee that a settlement will be reached. In that event, there also appears to be no guarantee that the Union will find the grievance sufficiently meritorious to warrant the time and expense of proceeding to arbitration.[8]

At that point, according to the possible meaning of the contract suggested by the district court, an individual grievant whose complaint involved a disciplinary penalty would appear to have exhausted his personal remedies since a disciplinary grievance "may be submitted to arbitration by either party," that is, only by the Union or the Company. In the case of a non-disciplinary grievance, however, it would appear that an individual could initiate arbitration of the matter, there being no requirement that such a grievance be submitted by either party. The only requirements would appear to be that the matter have been processed completely through the contractual grievance procedure and that the grievant have received the "written mutual agreement" of the Union and the Company prior to submission.

6. The Union does argue that the disciplinary penalty section of Article IV is the "broad" mandatory arbitration provision of the contract and that the paragraph in question here, which paragraph appears before the penalty section in the contract, is a narrow exception. Such an argument stretches and twists the plain meaning of the words of the agreement further than even the most elastic of rational minds can accept.

7. In its opinion in the first action the district court concluded that "the arbitration clause . . . will be presumed to be mandatory as

its language expressly states." The court, in its opinion in the instant case, however, softened its stance finding that "[i]n terms of literal requirement of written authorization of Article IV which calls for arbitration, undoubtedly it can be read in different ways—both as mandatory and permissive."

8. There is nothing in the record before this Court to indicate that the Union has obligated itself to its members to pursue their claims through the arbitration process once it has taken them through the grievance procedure.

We agree with the district court that one could read the provision in that manner. But that reading would require us to view the paragraph in question as if it were standing alone, without the remaining provisions of the contract, including the remaining provisions of the arbitration clause itself. When taken in context, it is clear that the disputed paragraph cannot be so interpreted.

First, Article IV provides that "[t]he award of an arbitrator upon any grievance subject to arbitration . . . shall be final and binding upon all parties to this Agreement." The only parties to the agreement are the Company and the Union. Should an individual process his own grievance through arbitration, the arbitrator's decision would not be binding upon him. It would be a rather disproportionate concession for the Company to agree to be bound by an arbitrator's decision without requiring that an individual grievant also agree to be bound by that decision.

Similarly, were we to adopt the construction of the agreement urged by the Union and apparently accepted by the district court as outlined above, the contract would be left devoid of any provision for arbitration of non-disciplinary grievances initiated by the Union itself, a result which would run afoul of the very policy to encourage private settlement of labor disputes which the district court was so zealously attempting to protect. The only arbitration provisions contained in the contract are the two paragraphs set forth in Article IV, the disputed paragraph and the separate paragraph covering disciplinary penalties. If, as the Union suggests, the disputed paragraph refers to grievances brought by individual grievants, there is then no remaining arbitration provision in the contract to cover non-disciplinary grievances initiated by the Union itself. Indeed, the present controversy, since it was initiated by the Union and is admittedly non-disciplinary, would be denied arbitration under such a construction of the disputed paragraph. We are convinced that the parties did not intend to foreclose all arbitration of non-disciplinary grievances initiated by the Union and therefore reject, as unreasonable, any construction which would mandate that result.

The Union and the district court suggest that Article XXI of the agreement, the so-called "no strike" provision, "lend[s] support" for the conclusion that the disputed paragraph calls for mandatory arbitration. The "no strike" provision, sometimes referred to judicially as the *quid pro quo* for the agreement to arbitrate labor disputes, *see e. g., United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 567, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403, 1406 (1960), in the present case provides that "[t]here shall be no strike . . . unless and until all of the respective provisions of the successive steps of the grievance procedure . . . have been complied with by the Association or *if* the matter is submitted to arbitration as provided in Article IV." (emphasis supplied). It simply does not follow that the parties to a collective bargaining agreement have agreed to mandatory arbitration merely because the Union has agreed not to strike over a grievance if that grievance has been submitted to arbitration. Admittedly, an employer's willingness to tolerate a strike over a dispute does not relieve it of a contractual duty to arbitrate, *Globe Seaways, Inc. v. National Marine Eng. Ben. Ass'n,* 451 F.2d 1159, 1163 (2 Cir. 1971), but neither does the duty to arbitrate arise from a willingness to accept a strike over such disputes. We thus find no support in the "no strike" provision for the conclusion that the agreement called for mandatory arbitration.

Finally, the district court also suggested that the disputed paragraph, and more particularly the "mutual consent" provision, could be read as a procedural requirement that the parties must come to written agreement on the issues to be arbitrated before proceeding to mandatory arbitration. It concluded that if that were the intent of the parties, such a provision could not be used to circumvent mandatory arbitration. *See Socony Vacuum Tanker Men's Ass'n v. Socony Mobil Oil Co.,* 369 F.2d 480 (2 Cir.

1966).[9] Again, it would be unreasonable to read the provision so narrowly. Nowhere in the entire paragraph, indeed in all of Article IV, does there appear any mention of the concept of "issues to be arbitrated," as opposed to the general concept of arbitration. Clearly, the consent referred to in that paragraph refers to that entire general concept rather than to any unmentioned specific such as the particular issue to be arbitrated.

 As mentioned at the outset, we recognize and reaffirm the oft repeated principle that where the interpretation of a contractual arbitration provision may lead to economic warfare rather than to mandatory arbitration, such an interpretation must be the result of "clear and unambiguous" language in the agreement. *Carey v. General Electric Co.,* 315 F.2d 499 (2 Cir. 1963), *cert. denied,* 377 U.S. 908, 84 S.Ct. 1162, 12 L.Ed.2d 179 (1964). We hold in this case simply that the language in the present contract clearly and unambiguously provided for only voluntary or permissive arbitration of the dispute between the parties and that it was error for the district court to compel arbitration in such a case.[10]

Reversed and remanded to the district court with instructions to vacate the injunction and to dismiss the petition.

9. In *Socony Vacuum* the parties had agreed to *submit to arbitration questions of fact arising out of interpretation of the agreement "at the request of either party,"* an obviously mandatory arbitration provision. *The defendant company, however, argued that the parties' further agreement that "[t]he statement of the question to be arbitrated shall be mutually agreed on,"* would allow a party to avoid arbitration if there were *no agreement on the statement of* the question to be arbitrated. This Court rejected that argument and interpreted the provision to mean that the parties must make a reasonable effort to agree on the question to be arbitrated and that, failing such agreement, the court may determine the question to be arbitrated.

10. Because we hold that the language of the agreement itself clearly did not bind the Company to arbitrate the instant dispute, there is no need to examine the extrinsic evidence submitted by the Company in its attempt to show the intent of the parties at the time of contracting. Compare *Strauss v. Silvercup Bakers, Inc.,* 353 F.2d 555, 558 (2 Cir. 1965), with *Affiliated Food Distributors, Inc. v. Local Union No. 229,* 483 F.2d 418, 420 n. 4 (3 Cir. 1973), *cert. denied,* 415 U.S. 916, 94 S.Ct. 1412, 39 L.Ed.2d 470 (1974).