20-1946 (L)
ExxonMobil Oil Corporation v. TIG Insurance Company

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2021
Nos. 20-1946 (L), 21-2658 (Con.)

EXXONMOBIL OIL CORPORATION,
*Petitioner-Appellee*,

*v.*

TIG INSURANCE COMPANY,
*Respondent-Appellant*.

On Appeal from the United States District Court
for the Southern District of New York

ARGUED: MAY 10, 2022
DECIDED: AUGUST 12, 2022

Before: WALKER, NARDINI, and MENASHI, *Circuit Judges*.

TIG Insurance Company ("TIG") appeals from a judgment and order of the United States District Court for the Southern District of New York (Edgardo Ramos, *Judge*, and Mary Kay Vyskocil, *Judge*, respectively). TIG asserts that Judge Ramos erred in ordering it to arbitrate a coverage dispute with ExxonMobil Oil Corporation

("Exxon"). Even if it was required to arbitrate, TIG contends that Judge Ramos erred in awarding Exxon prejudgment interest when confirming the arbitral award. After entering judgment, and after TIG had appealed, the district court clerk notified the parties that it was brought to Judge Ramos's attention that he owned stock in Exxon when he presided over the case. Nothing in the record suggests that Judge Ramos was aware of his conflict at the time he rendered his decisions, and the parties do not suggest otherwise. TIG moved in the district court to vacate the judgment. The case was reassigned to Judge Vyskocil, who denied the motion to vacate. TIG appealed from that denial as well.

We hold that vacatur was not required because this case presents only questions of law, and a non-conflicted district judge reviewed the case *de novo*. As to the merits, we hold that the district court did not err in compelling arbitration because the parties were subject to a binding arbitration agreement, but that the district court erred in ordering TIG to pay pre-arbitral-award interest. Accordingly, we AFFIRM the district court's denial of the motion to vacate and the district court's order compelling arbitration, REVERSE in part its decision granting Exxon's request for prejudgment interest, and REMAND to the district court for further proceedings consistent with this opinion.

---

DANIEL M. SULLIVAN (Daniel P. Goldberg, Alison B. Miller, and Denisha S. Bacchus, *on the brief*), Holwell Shuster & Goldberg LLP, New York, NY, *for Respondent-Appellant*.

DONALD W. BROWN (Allan B. Moore, Covington & Burling LLP, Washington,

2

DC, P. Benjamin Duke, Andrew W. Hahn,
Covington & Burling LLP, New York, NY,
*on the brief*), Covington & Burling LLP, San
Francisco, CA, *for Petitioner-Appellee*.

WILLIAM J. NARDINI, *Circuit Judge*:

This case involves two distinct issues. First, we consider whether vacatur is required where judgment was entered by a first district judge who belatedly realized that he had a conflict of interest, and a second non-conflicted judge then reviewed the merits of that decision *de novo*. Second, if vacatur is unwarranted, we determine the existence and scope of an arbitration agreement between the parties.

TIG Insurance Company ("TIG") appeals from a judgment and order of the United States District Court for the Southern District of New York (Edgardo Ramos, *Judge*, and Mary Kay Vyskocil, *Judge*, respectively). TIG asserts that Judge Ramos erred in ordering it to arbitrate a coverage dispute with ExxonMobil Oil Corporation ("Exxon"). Even if it was required to arbitrate, TIG further contends,

Judge Ramos erred in awarding Exxon prejudgment interest when confirming the arbitral award.

After entering judgment, and after TIG initially appealed, the district court clerk notified the parties that it had been brought to Judge Ramos's attention that he owned stock in Exxon when he presided over the case. Nothing in the record suggests that Judge Ramos was aware of his conflict at the time he rendered his decisions, and the parties do not suggest otherwise. TIG moved in the district court to vacate the judgment. The case was reassigned to Judge Vyskocil, who denied the motion to vacate. TIG appealed from that denial as well.

We AFFIRM the district court's denial of the motion to vacate. Vacatur was not required because this case presents only questions of law, and a non-conflicted district judge reviewed the case *de novo*. As to the merits, we AFFIRM the district court's order compelling arbitration and REVERSE in part its decision granting Exxon's request

4

for prejudgment interest and REMAND to the district court for further proceedings consistent with this opinion.

## I. Background

### A. The TIG insurance policy

TIG issued an excess insurance policy (the "Policy"), insuring Exxon for liability for damages from personal injury or property damage resulting from the use of Exxon's products.[1] The coverage was limited to $25 million.

The Policy states that it should be "construed in an evenhanded fashion as between the Insured and the Company; without limitation, where the language of this Policy is deemed to be ambiguous or otherwise unclear, the issue shall be resolved in the manner most consistent with the relevant provisions, stipulations, exclusions and conditions (without regard to authorship of the language, without

---

[1] The Policy was initially issued to Mobil Corporation, which was later acquired by Exxon Corporation, becoming the ExxonMobil Oil Corporation. For convenience, we refer to the insured party as "Exxon."

any presumption or arbitrary interpretation or construction in favor of either the Insured or the Company and without reference to parol evidence)." Joint App'x at 38.

The Policy contained customized language regarding arbitration. The parties deleted a provision in the original Policy form that would have clearly constituted a binding arbitration agreement, which stated that "[a]ny dispute arising under this Policy shall be finally and fully determined in London, England under the provisions of the English Arbitration Act of 1950." *Id.* at 37. Instead of this stock provision, the parties added Endorsement No. 11—"Alternative Dispute Resolution Endorsement" (the "ADR Endorsement"). *Id.* at 60. Because the ADR Endorsement is the crux of the dispute on appeal, we set it out in full below:

**ALTERNATIVE DISPUTE RESOLUTION ENDORSEMENT**

If the Company and the Insured disagree, after making a good faith effort to reach an agreement on an issue concerning this policy, either party may request that

6

the following procedure be used to settle such disagreement:

1. The Company or the Insured may request of the other in writing that the dispute be settled by an alternative dispute resolution ("ADR") process, selected according to the procedures described herein.

2. If the Company and the Insured agree to so proceed, they will jointly select an ADR process for settlement of the dispute.

3. ADR processes which may be used may include but are not limited to mediation, neutral fact-finding and binding arbitration (as described in paragraph (4)). By agreement of the parties, the services of the American Arbitration Association, Judicial Arbitration & Mediation Services Inc., Endispute Inc., or the Center for Public Resources Inc. may be used to design or to implement any ADR process.

4. If the parties cannot agree on an ADR process within 90 days of the written request described in paragraph (1), the parties shall use binding arbitration. The arbitration shall be conducted by a mutually acceptable arbitrator to be chosen by the parties. Neither party may unreasonably withhold consent to the selection of an arbitrator; however, if the parties cannot select an arbitrator within 45 days after binding arbitration is selected

under paragraph (2) or is [sic] the ADR process because of this paragraph, the selection of the arbitrator shall be made by one of the consultants listed in paragraph (3). The arbitration proceeding shall take place in or in the vicinity of New York and will be governed by such rules as the parties may agree. The parties expressly waive any pre-hearing discovery about the dispute, including examination of documents and witnesses. It is expressly agreed that the result of such binding arbitration shall not be subject to appeal by either party.

5. All expenses of the ADR process will be shared equally by both parties.

6. It is expressly agreed that any decision, award, or agreed settlement made as a result of an ADR process shall be limited to the limits of liability of this Policy.

7. Any statutes of limitations which may be applicable to the dispute shall be tolled, from the date that the Company and the Insured agree to follow the selection procedures described herein with respect to such dispute, until and including the date that such ADR process is concluded.

*Id.*

8

## B. Procedural history

In the 1990s, Exxon faced a series of lawsuits related to its use of methyl tertiary-butyl ether (MTBE) as a gasoline additive. As a result of these suits, by 2019, Exxon had paid $46 million in settlements and faced judgments totaling over an additional $269 million. It sought indemnification from TIG under the Policy, but TIG disputed that the Policy covered the MTBE suits. The parties engaged in settlement discussions, which ended on November 30, 2016, when TIG filed suit in the New York Supreme Court seeking a declaration that the Policy did not cover the MTBE-related losses. Nine days later, Exxon sent a letter "formally invok[ing] its contractual right under the Policy and Federal law to settle the parties' disagreement over coverage under the Policy for Exxon[]'s MTBE insurance claim by binding arbitration." Joint App'x at 82. Exxon filed a petition to compel arbitration in federal district court the same day. Exxon also asked the court to enjoin TIG from pursuing its New York declaratory judgment action.

9

### 1. The district court grants the petition to compel arbitration

In support of its petition to compel arbitration, Exxon argued—and the district court (Judge Ramos) agreed—that the ADR Endorsement amounted to a binding arbitration agreement. The court focused on the first clause in paragraph 2 of the ADR Endorsement: "If the [C]ompany and the [I]nsured agree to so proceed, they will jointly select an ADR process for settlement of the dispute." Spec. App'x at 24; *see* Joint App'x at 60. It concluded that the conditional introductory phrase ("If the Company and the Insured agree . . .") referred only to the second clause in that sentence ("they will jointly select . . . ."). Spec. App'x at 24. Thus, the ADR Endorsement would allow the parties to use any ADR procedure on which they jointly agreed. If one party requested ADR and the parties could not jointly agree on the ADR process, however, the ADR Endorsement "defaults to binding arbitrations." Spec. App'x at 25.

In so ruling, the district court rejected TIG's argument that the introductory clause in paragraph 2 meant that the entire ADR Endorsement procedure (not just the joint selection process) is triggered only if the parties agree to settle their dispute via ADR. The district court reasoned that New York courts read contracts to "give force and effect to all of [their] provisions," and reading the introductory clause as TIG urged would mean the ADR Endorsement would not "have any binding effect absent some further agreement." Spec. App'x at 25 (citing *Trump-Equitable Fifth Ave. Co. v. HRH Constr. Corp.*, 485 N.Y.S.2d 65 (1st Dep't), *aff'd*, 66 N.Y.2d 779 (1985)). The ADR Endorsement would be "an unenforceable and superfluous agreement to agree, under which neither party could require any form of ADR absent some further agreement." *Id.* The court also noted that its interpretation was "consistent with the federal policy in favor of construing arbitration clauses broadly." Spec. App'x at 25–26. The court thus granted the petition to compel arbitration, stayed

11

all proceedings in the case, and retained jurisdiction to address other issues that might arise after the arbitrators rendered any awards. *Id.*

## 2. The arbitral tribunal rules in favor of Exxon

On August 7, 2019, the arbitral tribunal ruled in favor of Exxon. It held that Exxon's total liability exceeded $350 million, therefore reaching and exhausting TIG's excess layer of liability coverage. It thus awarded Exxon the full $25 million allowed under the Policy. Before the tribunal, Exxon also sought prejudgment interest. The tribunal held that it lacked jurisdiction to grant Exxon's request. It explained that "[a]n arbitral award is [an] all-inclusive term" that includes "damages, interest, costs and legal fees that a panel may determine is owing on a claim." Joint App'x at 164. The ADR Endorsement stated "that any decision, award, or agreed settlement made as a result of an ADR process shall be limited to the limits of liability of this Policy." Joint App'x at 60. Accordingly, the tribunal concluded it was "foreclosed from awarding more than [the] limit of liability in the TIG's policy of $25 million." Joint App'x at 164. It

12

explained in a footnote, though, that one New York Appellate Division opinion "seem[ed] to imply that where the arbitrator would lack jurisdiction or be prohibited from making an award of pre-judgment interest and the claimant could not have sought an award of interest, the claimant is not foreclosed from seeking such pre-judgment interest in a subsequent court proceeding to confirm an award." Joint App'x at 165 n.4 (citing *Levin & Glasser, P.C. v. Kenmore Prop., LLC*, 70 A.D.3d 443, 445–46 (1st Dep't 2010)).

### 3. The district court confirms the arbitral award and grants prejudgment interest

On November 21, 2019, Exxon moved in the district court to confirm the arbitral award and sought prejudgment interest. TIG cross-moved to vacate the award. The district court (Judge Ramos) granted Exxon's motion and denied TIG's on May 18, 2020.

*ExxonMobil Oil Corp. v. TIG Ins. Co.*, No. 16-9527, 2020 WL 2539063

(S.D.N.Y. May 18, 2020) (*Exxon I*).[2]

The district court held that it had authority to award

prejudgment interest where the arbitral tribunal had not.  Under New

York law, the district court explained, prejudgment interest is

ordinarily mandatory on damages awarded as a result of a breach of

performance of a contract.  Although parties may contract around the

requirement, courts apply a clear-statement rule for contracts

purporting to waive that mandatory requirement.  The district court

ultimately concluded that paragraph 6 of the ADR Endorsement was

not sufficiently clear to infer that the parties intended to waive their

right to prejudgment interest.  The court explained that "a reasonable

businessperson considering whether to agree to the Policy would

likely have read the ADR Endorsement not to prevent a court from

_____

[2] TIG does not challenge the portion of the district court's opinion confirming the arbitral award.

14

awarding interest if TIG were found to owe the entire policy limit in damages." *Id.* at *9. Accordingly, the court awarded Exxon 9% *per annum* interest for the period between TIG's breach of contract and the date of the arbitral award. The court also awarded Exxon 9% *per annum* interest from the date of the award through the date of the court's judgment. The court directed the parties to submit a proposed judgment reflecting this calculation. On May 26, 2020, the court entered judgment against TIG "in the amount of $33,010,245.90, representing the $25,000,000 awarded in the Award, plus pre-judgment interest on that amount . . . at the rate of 9% per annum in the amount of $8,010,245.90." Spec. App'x at 49.

On June 19, 2020, TIG filed a notice of appeal. It stated that it was appealing from (1) the order of the district court compelling arbitration; and (2) the district court's order granting Exxon's motion to confirm the arbitral award, denying TIG's motion to vacate the arbitral award, and granting Exxon prejudgment interest. In its

15

opening brief, TIG dropped its challenge to the portion of the district court's decision granting Exxon's motion to confirm the arbitral award and denying TIG's motion to vacate the award.

### 4. The district court discloses Judge Ramos's conflict of interest

On July 29, 2021, the Clerk of Court for the Southern District of New York sent the parties a letter disclosing that it had been brought to Judge Ramos's attention that he had owned stock in ExxonMobil Corporation while the case was pending before him. Although he reported that his stock ownership did not affect his decisions in the case, he recognized that such ownership would have required his recusal. Accordingly, Judge Ramos directed the Clerk to notify the parties of the conflict. Citing Advisory Opinion 71 from the Judicial Conference Codes of Conduct Committee, which deals with disqualification that is not discovered until after a judge has participated in a case, the letter invited the parties "to respond to Judge Ramos' disclosure of a conflict in this case." Vacatur App'x at

16

11. In response, TIG filed a motion in the district court to vacate the judgment. We held TIG's original appeal in abeyance pending the district court decision as to whether to deny the motion or issue an indicative ruling stating that the district court would grant the motion if we remanded for that purpose.[3]

On September 28, the Wall Street Journal published an article reporting that "[m]ore than 130 federal judges ha[d] violated U.S. law and judicial ethics by overseeing court cases involving companies in which they or their family owned stock." James V. Grimaldi, Coulter Jones & Joe Palazzolo, *131 Federal Judges Broke the Law by Hearing Cases Where They Had a Financial Interest*, Wall St. J., Sept. 28, 2021. The

---

[3] If a party files a motion for relief from judgment under Federal Rule of Civil Procedure 60(b) after filing a notice of appeal, but within 28 days of the entry of judgment, the motion suspends the effect of the notice of appeal until the district court rules on the post-judgment motion. Fed. R. App. P. 4(a)(4)(B)(i). If such a motion is filed more than 28 days after judgment is entered, the district court is without jurisdiction to grant the motion while the appeal is pending. Under Rule 62.1, a district court may nevertheless "(1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue."

17

article reported that Judge Ramos had held "between $15,001 and $50,000 of Exxon stock" when he ruled in Exxon's favor. *Id.* The article reported that the Clerk of Court notified the parties in this case of the conflict after the newspaper had contacted Judge Ramos to ask about the apparent conflict.

The district court clerk reassigned the case to Judge Mary Kay Vyskocil, who reviewed the merits of the case *de novo* and denied TIG's motion to vacate on October 14, 2021. *ExxonMobil Oil Corp. v. TIG Ins. Co.*, No. 16-9527, 2021 WL 4803700, at *4 (S.D.N.Y. Oct. 14, 2021) (*Exxon II*). Judge Vyskocil acknowledged that Judge Ramos "should have recused himself from this matter upon its assignment to him" under both 28 U.S.C. § 455(a) and the Code of Conduct for United States Judges, Cannons 2(A) and 3(C)(1)–(2). *Id.* at *2. She explained that harmless error review applies to violations of § 455(a). *Id.* Thus, Judge Vyskocil explained that she would deny the motion to vacate if she agreed that Judge Ramos's rulings were correct

18

"because Respondent would not have been harmed as regards this proceeding." *Id.*

After reviewing all of the relevant court documents, Judge Vyskocil agreed with Judge Ramos's reasoning and denied the motion to vacate. She adopted Judge Ramos's orders granting Exxon's motion to compel and awarding prejudgment interest. TIG filed a new notice of appeal from Judge Vyskocil's decision.

## II. Discussion

We consider first whether Judge Ramos's conflict of interest required Judge Vyskocil to vacate the judgment and restart the entire case anew. Because we conclude that it did not, we then consider whether the district court erred in compelling arbitration and awarding prejudgment interest.

### A. Remedy for the violation of 28 U.S.C. § 455(a)

TIG argues that we need not consider the merits of its original appeal because we must vacate the district court's judgment in light of Judge Ramos's financial interest in Exxon. We disagree.

19

Both statutes and court rules govern questions of judicial recusal when a disqualifying conflict is discovered after a judge enters a ruling. The baseline rule is provided by 28 U.S.C. § 455(a), which states that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The Supreme Court has explained that "Section 455 does not, on its own, authorize the reopening of closed litigation" but "Federal Rule[] of Civil Procedure 60(b) provides a procedure whereby, in appropriate cases, a party may be relieved of a final judgment." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 (1988). "We review a district court's decision on a Rule 60(b) motion for abuse of discretion. A court abuses its discretion when (1) its decision rests on an error of law or a clearly erroneous factual finding; or (2) cannot be found within the range of permissible decisions." *In re Terrorist Attacks on Sept. 11, 2001*, 741 F.3d 353, 357 (2d Cir. 2013) (cleaned up).

Although a judge must recuse when there is a disqualifying conflict, the proper remedy varies when such a conflict is discovered after the judge's ruling. In *Liljeberg*, a district court judge ruled after a bench trial in favor of a party to a real estate transaction in a manner that benefited a private university. Although the university was not a party to the suit, it had negotiated with one of the parties and maintained an interest in the transaction at issue. The losing party subsequently learned that the district judge had been on the board of trustees for the university when he presided over the case. It moved to vacate the judgment under Rule 60(b)(6)—which permits relief for "any other reason that justifies" it—on the basis that the judge was disqualified under § 455(a). The Fifth Circuit held that the judge's conflict created an appearance of impropriety and that the appropriate remedy was to vacate his decision.

The Supreme Court agreed that disqualification was required, and that vacatur was justified in light of several factors. The Court

emphasized first that "[s]cienter is not an element of a violation of § 455(a)." *Liljeberg*, 486 U.S. at 859. Section 455(a) is intended to "avoid even the *appearance* of partiality," so "recusal is required even when a judge lacks actual knowledge of the facts indicating his interest or bias in the case if a reasonable person, knowing all the circumstances, would expect that the judge would have actual knowledge." *Id.* at 860–61 (emphasis added) (quoting *Health Servs. Acquisition Corp. v. Liljeberg*, 796 F.2d 796, 802 (5th Cir. 1986)). When a judge violates § 455, a new, unconflicted judge may, but is not required to, vacate the judgment or any decisions rendered by the conflicted judge. *Liljeberg*, 486 U.S. at 863-64. Whether vacatur is appropriate must be evaluated on a case-by-case basis:

> [I]n determining whether a judgment should be vacated for a violation of § 455(a), it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process.

*Id.* at 864.

22

TIG contends that Judge Vyskocil erred by failing to explicitly consider the factors that the Supreme Court laid out in *Liljeberg*. As we have emphasized, § 455(a) "deals exclusively with appearances." *United States v. Amico*, 486 F.3d 764, 775 (2d Cir. 2007). "Its purpose is the protection of the public's confidence in the impartiality of the judiciary." *Id.* Although the Supreme Court in *Liljeberg* did not set forth a definitive test for assessing when vacatur is required, *see Liljeberg*, 486 U.S. at 864 (describing the factors as "*appropriate* to consider" (emphasis added)), it is preferable for a court reviewing a potential violation of § 455(a) to explicitly discuss how the factors from *Liljeberg* apply.

The decision here could have benefited from a more detailed discussion, but Judge Vyskocil's analysis addressed the *Liljeberg* factors. Judge Vyskocil explicitly weighed the likelihood of harm to the parties as a result of Judge Ramos's conflict, including reconsidering portions of Judge Ramos's decisions that TIG had not

23

challenged on appeal. *See, e.g.*, *Exxon II*, 2021 WL 4803700, at *3 ("[T]he Court concludes that Respondent was not harmed by Judge Ramos' Order granting Petitioner's Motion to Confirm the Arbitration Award."). She also directly addressed the public's perception of the court. *Id.* *2. While the purposes of § 455 might be better served by a more thorough discussion that addressed each *Liljeberg* factor individually and at greater length, we cannot conclude Judge Vyskocil's decision was procedurally deficient.

We turn, then, to the substance of TIG's motion to vacate. Judge Ramos held between $15,001 and $50,000 in stock in Exxon's parent company when he issued his decisions in this case. His failure to recuse himself was indisputably a serious error. As Judge Vyskocil recognized, violations of § 455(a) are harmful because "the integrity of the judicial process is paramount and the potential damage from impairment of the public confidence in the judicial process is a serious concern." *Id.* Once such an error occurs, the analysis that we carry

24

out is an exercise in mitigation aimed at restoring the public's confidence in the courts and protecting litigants' access to fair, efficient, and unbiased adjudication. Applying the principles from *Liljeberg*, we conclude that vacatur was not required in light of Judge Vyskocil's *de novo* review.[4]

First, there is little "risk of injustice" to TIG absent vacatur. *Liljeberg*, 486 U.S. at 864. This case presents purely legal questions of contract interpretation: whether the Policy includes a binding arbitration agreement, and whether the language of the Policy waives the parties' rights to prejudgment interest. Judge Vyskocil considered

---

[4] TIG argues that Judge Vyskocil's review was not truly *de novo*, and that she afforded some unspecified measure of deference to Judge Ramos's decision. But Judge Vyskocil explained that she had "reviewed the Petition to Compel Arbitration, the Motions, and relevant filings in this proceeding, as well as the Orders and Opinions issued by Judge Ramos." *Exxon II*, 2021 WL 4803700, at *2. We discern nothing in Judge Vyskocil's opinion suggesting that she gave any weight—let alone undue or conclusive weight—to Judge Ramos's reasoning. We reject the contention that a district court must turn a blind eye to the proceedings that occurred in a case before a potentially conflicted judge. Appellate courts routinely consider district courts' decisions in the course of conducting *de novo* review. Judge Vyskocil did not err in framing her opinion in the context of Judge Ramos's earlier decisions.

25

the issues afresh and rendered an independent decision after reviewing the record. TIG offers no basis to conclude that Judge Vyskocil's opinion was in any way tainted by Judge Ramos's conflict, nor does it identify any argument that it was unable to make as a result of the procedure used in this case. There is no reason to force the parties to relitigate the entire case, likely causing significant delay, in the absence of any basis to conclude that doing so would lead to a more just outcome.

Next, TIG argues that denying its request to vacate the judgment would produce injustice in other cases because litigants would be disincentivized from examining grounds for disqualifying conflicted judges if they thought courts would not take such motions seriously. *See id.* at 868 ("[P]roviding relief in cases such as this will not produce injustice in other cases; to the contrary, the Court of Appeals' willingness to enforce § 455 may prevent a substantive injustice in some future case by encouraging a judge or litigant to

26

more carefully examine possible grounds for disqualification and to promptly disclose them when discovered."). The risk of harm in future cases is minimal here, though, because the district court disclosed the conflict as soon as Judge Ramos became aware of it, and because TIG has had ample opportunity to challenge Judge Ramos's rulings both in the district court and on appeal.

Finally, declining to vacate the judgment here does not risk further "undermining the public's confidence in the judicial process." *Id.* at 864. To be sure, this case has already drawn significant public attention, *see* Grimaldi et al., *supra* p. 17, and Judge Ramos's failure to recuse himself before ruling was a significant error. Our task now is to determine how best to move forward and preserve the public's confidence in our federal courts. As noted earlier, this case presents pure questions of law; the district court was tasked with determining what the language in the parties' contract means. Although Judge Ramos addressed that question while conflicted, an unconflicted

district judge then gave the case a fresh look—that is, she reviewed his decision *de novo*.[5]  Now, on appeal, three more unconflicted judges review the parties' arguments—again *de novo*—to decide what the contract means.  This procedure assures that the final disposition of the case is not affected by any conflict of interest.  Indeed, the questions have now been reviewed by four disinterested judges.  The public also has an interest in speedy adjudication of disputes, an interest that would not be furthered by forcing the parties to re-brief the same issues for a third time.  We therefore conclude that declining to vacate the judgment poses little additional risk to the public's confidence in the judiciary.

In sum, the *Liljeberg* factors weigh against vacatur.  This case presents purely legal questions which were reviewed completely

---

[5] We note that nothing in the record suggests that Judge Ramos was aware of his conflict at the time he rendered his decisions, and the parties do not suggest otherwise.  It was nonetheless appropriate for a second district judge to review the case *de novo* because § 455 is designed to "avoid even the *appearance* of partiality." *Liljeberg*, 486 U.S. at 860 (emphasis added).

afresh by a district judge who had no conflicts.  Vacating the judgment would delay the case for months or longer, all to no benefit.  We are satisfied that Judge Ramos's conflict did not influence Judge Vyskocil's decision, nor will it affect our disposition of this case.  Accordingly, we affirm Judge Vyskocil's denial of TIG's motion to vacate the judgment and turn to the merits of the appeal.

### B.    The ADR Endorsement

Exxon argues, and the district court agreed, that the ADR Endorsement is a binding arbitration agreement.  TIG contends that the ADR Endorsement simply reflects those procedures that govern if one party requests ADR and the counterparty agrees.  Neither party's interpretation is entirely satisfactory.  But where Exxon's reading is strained, TIG's directly contradicts the language of the ADR Endorsement.  And "when you have eliminated the impossible, whatever remains, however improbable, must be the truth."  Arthur Conan Doyle, The Sign of Four 93 (1890) (emphasis omitted).  Accordingly, we conclude that the ADR Endorsement is a binding

arbitration agreement and affirm the district court's order compelling arbitration.

"We review *de novo* the grant of a motion to compel arbitration." *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 180 (2d Cir. 2021); *see Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 119 (2d Cir. 2010) ("The determination of whether parties have contractually bound themselves to arbitrate a dispute is a determination involving interpretation of state law and hence a legal conclusion also subject to *de novo* review." (cleaned up)). "In deciding a motion to compel arbitration, courts apply a standard similar to that applicable for a motion for summary judgment. Courts must consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and must draw all reasonable inferences in favor of the non-moving party." *Cooper*, 990 F.3d at 179–80 (cleaned up).

30

Although "the Federal Arbitration Act ('FAA') embodies a national policy favoring arbitration[,] . . . a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." *Id.* at 179 (cleaned up). "Courts consider two factors when deciding if a dispute is arbitrable: (1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue." *Id.* (internal quotation marks omitted). Because "arbitration is simply a matter of contract between the parties . . . [t]he threshold question of whether the parties indeed agreed to arbitrate is determined by state contract law principles." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (cleaned up). The Policy here provides that it is "governed by and construed in accordance with the internal laws of the State of New York." Joint App'x at 38. The key question is whether the parties agreed to arbitrate at all.

31

Under New York law, "insurance contracts must be interpreted according to common speech and consistent with the reasonable expectation of the average insured." *Dean v. Tower Ins. Co. of N.Y.*, 19 N.Y.3d 704, 708 (2012). Courts in New York avoid construing contracts in ways that "would leave contractual clauses meaningless." *Two Guys from Harrison-NY, Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 403 (1984).

Ordinarily, "ambiguities in an insurance policy are to be construed against the insurer." *Dean*, 19 N.Y.3d at 708 (cleaned up). Here, though, the Policy expressly states that it should be "construed in an evenhanded fashion" and ambiguities must be resolved "in the manner most consistent with the relevant provisions, stipulations, exclusions and conditions (without regard to authorship of the language, without any presumption or arbitrary interpretation or construction in favor of either the Insured or the Company and without reference to parol evidence)." Joint App'x at 38.

### 1. TIG's view

TIG argues that the ADR Endorsement creates a three-step procedure for ADR that permits, but does not require, arbitration.

First, the preamble and paragraph 1 of the ADR Endorsement state that, in the event of a dispute, either party "may request" to settle the dispute via ADR "in writing." Joint App'x at 60. Second, the introductory phrase in paragraph two ("If the Company and the Insured agree to so proceed") means that the remaining procedures apply only if the requestee agrees to the settle the dispute via ADR. *See id.* ¶ 2. Finally, if the parties agree to ADR but cannot agree on the format within 90 days, then paragraph 4 dictates that the parties "shall use binding arbitration." *Id.* ¶ 4.

TIG notes that we have recognized the validity of contracts that permit arbitration only if both parties agree to arbitrate a given dispute. In *Gangemi v. General Electric Company*, an arbitration agreement between a company and union provided that a dispute about the "interpretation and application" of the contract "may be

33

submitted to arbitration only after it has been properly processed in accordance with the provisions of Article III and with prior written mutual agreement" of the parties. 532 F.2d 861, 863 n.2 (2d Cir. 1976). In contrast to that provision, the contract specified that a grievance "involving a disciplinary penalty . . . may be submitted to arbitration" if it remains disputed after it is processed through an administrative procedure. *Id.* The union moved to compel arbitration on non-disciplinary topics to which the company would not agree. The district court held that the language of the contract made arbitration mandatory and granted the motion to compel. *Id.* at 864. We reversed. We explained that the arbitration clause did not include the "'broad' or 'standard' mandatory arbitration clause common to many collective bargaining agreements." *Id.* at 865. Because the parties' dispute was not a disciplinary grievance, for which arbitration would have been "concededly mandatory," it was subject to arbitration

34

"only by consent" of both parties. *Id.* at 866. "[C]ourts are powerless, absent such consent, to compel arbitration." *Id.*

### 2. Exxon's view

In Exxon's view the parties are set inexorably on the path to arbitration once either party requests to settle a dispute by ADR, unless the parties jointly adopt another ADR procedure. Exxon contends that the introductory clause of paragraph 2 ("If the Company and the Insured agree to so proceed") applies to the second clause in that paragraph ("they will jointly select an ADR process for settlement of the dispute") rather than what came before. Joint App'x at 60. Thus, on Exxon's read, paragraph 2 means that the parties *may* select an ADR procedure other than arbitration if they agree on an alternative.

If they do not "agree to so proceed"—i.e., to select an alternative—then paragraph 4 clarifies that the default is arbitration. The first sentence of that paragraph provides: "If the parties cannot agree on an ADR process within 90 days of the written request

described in paragraph (1), the parties shall use binding arbitration."
*Id.* Exxon argues that TIG's interpretation would render this sentence mere surplusage. Under TIG's reading, Exxon contends, a party could always avoid binding arbitration by withholding its consent to engage in the ADR selection procedure at all unless the counterparty agreed to something other than arbitration.

### 3. Exxon's view is a permissible interpretation of the Policy

Ultimately, neither party's read is without flaw. For its part, Exxon struggles to contend with the ostensibly permissive language in the Preamble and paragraph 1 of the ADR Endorsement. Joint App'x at 60. Exxon asserts that this language is consistent with the parties' intention to enter a binding arbitration agreement, relying on *Loc. 771, I.A.T.S.E., AFL-CIO v. RKO Gen., Inc., WOR Div.*, 546 F.2d 1107, 1116 (2d Cir. 1977). There, we noted that an arbitration clause stating that a dispute "may be submitted to arbitration . . . [is] the standard form for the submission of all disputes to an arbitrator." *Id.*

36

(cleaned up). But the word "may" means "ha[s] permission to." *May*, Merriam-Webster Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/may. In the "standard form" of a mandatory arbitration agreement we considered in *Local 771*, the "may" preceded *submit*. 546 F.2d at 1115. Thus, one party had "permission to" submit a claim to arbitration unilaterally. In contrast, here, the "may" precedes *request*. One party "has permission to" ask the other party to proceed via ADR. The introductory paragraphs of the ADR Endorsement, standing alone, suggest that either party may request arbitration, but neither party can require it.

But we cannot read the introductory paragraphs of the ADR Endorsement in isolation, and the problems for TIG arise in the first sentence of paragraph 4: "If the parties cannot agree on an ADR process within 90 days *of the written request* described in paragraph (1), the parties shall use binding arbitration." Joint App'x at 60

37

(emphasis added).  The natural meaning of this sentence is that the clock on arbitration starts ticking when one party requests ADR, regardless of whether the counterparty accedes to that request.

Exxon's reading of the ADR Endorsement may have its challenges, but TIG's directly contradicts the plain language of paragraph 4.  Faced with a choice between an interpretation that is difficult and another that is precluded by the text of the contract, we must adopt the former.  We therefore hold that the ADR Endorsement functions as a binding arbitration agreement.  When one party requests to settle a dispute via ADR, the parties have 90 days to choose the format.  If they fail to do so, they must arbitrate.

TIG points to two features of the contract that it says support its view that the ADR Endorsement is permissive.  While both are arguably in tension with the conclusion that the ADR Endorsement is mandatory, neither is irreconcilable.  First, TIG notes that, under the ADR Endorsement, applicable statutes of limitations are tolled "from

the date that the Company and the Insured agree to follow the selection procedures." Joint App'x at 60. Because the provision ties the tolling of any statutes of limitations to the *agreement* between the parties, TIG contends, such an agreement must be necessary to trigger the procedures described in the ADR Endorsement. *Id.* TIG presupposes that the parties intended to toll applicable statutes of limitations in every case where ADR would be used, but it cites no evidence to support that assumption. We conclude that paragraph 7 applies only when the parties reach an agreement to select an ADR procedure under paragraphs 2 and 3. *Id.* If the parties fail to reach an agreement, thereby defaulting to arbitration, then any applicable statutes of limitations continue to run.

Second, TIG argues that the parties' decision to delete a form mandatory arbitration clause suggests that they intended the ADR Endorsement to be different and therefore permissive. The Policy form originally contained a provision stating that "[a]ny dispute

39

arising under this Policy shall be finally and fully determined in London, England under the provisions of the English Arbitration Act of 1950."  Joint App'x at 37.  The parties agreed to delete that arbitration provision and replace it with the ADR Endorsement. Although the parties may have intended to adopt something other than a binding arbitration agreement, that is not the only inference— or even the strongest inference—that the change would support.  For example, the change may have been due to a shift in the parties' venue preference (the ADR Endorsement moved the venue for arbitration from London to New York), the desire for more efficient dispute resolution (the ADR Endorsement waives the parties' right to any pre-hearing discovery), or a change in the parties' preference for the rules that would apply to the arbitration (the ADR Endorsement eliminated any reference to the English Arbitration Act, instead specifying that the parties would agree on the rules that applied).  We cannot conclude that the parties' decision to adopt the ADR Endorsement

40

implies that they intended to enter something other than a mandatory arbitration agreement.

In sum, while Exxon's reading of the ADR Endorsement is difficult in some respects, it is reconcilable with the provision's text. TIG's is not. We hold that the ADR Endorsement amounts to a mandatory arbitration agreement, and that the district court did not err in granting Exxon's motion to compel arbitration.

## C. Prejudgment interest

TIG next argues that, even if the district court properly granted Exxon's motion to compel arbitration, it erred in granting pre-award interest beyond the Policy limit of $25 million when it confirmed that award. "The award of interest is generally within the discretion of the district court and will not be overturned on appeal absent an abuse of discretion." *New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*, 352 F.3d 599, 602–03 (2d Cir. 2003).

In New York, by statute, the default rule is that pre-award interest "shall be recovered upon a sum awarded because of a breach

41

of performance of a contract." N.Y. C.P.L.R. § 5001(a). Interest accrues "from the earliest ascertainable date the cause of action existed," *id*. § 5001(b), and is generally mandatory. *J. D'Addario & Co. v. Embassy Indus., Inc.*, 20 N.Y.3d 113, 117 (2012); *see also New England Ins. Co.*, 352 F.3d at 603. Pre-award interest "is not a penalty," and is intended to "compensate the wronged party for the loss of use of the money." *J. D'Addario & Co.*, 20 N.Y.3d at 117–18.

Statutory pre-award interest is not required or available, however, where the parties' contract is "sufficiently clear" that statutory interest was not "contemplated by the parties at the time the contract was formed." *Id*. at 118. In *J. D'Addario*, for example, a real estate buyer placed a down payment in escrow before closing. *Id*. at 116. The buyer then breached the contract and failed to attend the closing. *Id*. at 117. The contract specified that, in the event of a breach, liquidated damages was the "sole remedy" and "sole obligation," and that each party had "no further rights" beyond bank interest on the

42

down payment in escrow. *Id.* at 118. The New York Court of Appeals held that this language was "sufficiently clear" to establish that the parties intended to waive their rights to statutory pre-award interest. *Id.* The court rejected the plaintiff's "contention that the contract never expressly mentioned statutory interest, and that therefore their right thereto was not waived." *Id.*

Here, paragraph 6 is a "sufficiently clear" statement of the parties' intent to waive their right to statutory interest in arbitration to the extent that the interest plus the principal award would exceed the Policy limit of $25 million. That paragraph provides:

> It is expressly agreed that any decision, award, or agreed settlement made as a result of an ADR process shall be limited to the limits of liability of this Policy.

Joint App'x at 60. Exxon acknowledges that the phrase "any decision, award, or agreed settlement" includes the principal amount of $25 million that it won in arbitration. The arbitral panel concluded that "[b]ased on the insurance contract to which the parties entered . . . [it]

43

lack[ed] the jurisdiction to make an award that exceeds the limits of the TIG policy." Joint App'x at 163–64 ¶ 137. The panel explained that "[a]rbitral award is an all-inclusive term" and that a reasonable business person would understand it includes not only damages, but "interest, costs and legal fees." *Id.* at 164 ¶ 139. We agree with the panel's analysis and conclude that the language of the ADR Endorsement clearly waived the parties' rights to obtain pre-award interest in the arbitral proceeding.

Exxon argues that the arbitral panel declined to grant pre-award interest because it determined that it lacked jurisdiction to do so, not because it concluded that the parties waived their rights to pre-award interest entirely, and so the district court could award it. But under the language of the Policy, that is a distinction without a difference. "The scope of [an] arbitrator's authority must be determined from the language of the agreement, using accepted rules of contract law." *CBA Indus., Inc. v. Circulation Mgmt., Inc.*, 578

N.Y.S.2d 234, 237 (2d Dep't 1992). Here, the contract limited the recovery available "as a result of an ADR process" to the Policy limit, thereby restricting the arbitral panel's authority to grant any award beyond that amount. But a proceeding to confirm an arbitral award "ordinarily is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *Citigroup, Inc. v. Abu Dhabi Inv. Auth.*, 776 F.3d 126, 132 (2d Cir. 2015) (cleaned up). We hold that paragraph 6 of the ADR Endorsement waives the parties' rights to pre-award interest beyond the Policy limit under N.Y. C.P.L.R. § 5001(a), either in the arbitration itself or in the subsequent proceeding to confirm the award. Accordingly, we reverse the judgment of the district court to the extent that it granted interest through the date that the arbitral panel entered its award.

We reach a different conclusion with respect to interest accruing after the arbitral panel entered its award. New York recognizes two distinct periods of "prejudgment interest." First,

45

interest accrues under N.Y. C.P.L.R. § 5001(b) "from the earliest ascertainable date the cause of action existed" until the date the award is granted. Once the award is entered, interest accrues "upon the total sum awarded . . . from the date the verdict was rendered or the report or decision was made to the date of entry of final judgment." *Id.* § 5002. The arbitral panel's award was a "report or decision" within the meaning of the statute. *See E. India Trading Co. v. Dada Haji Ebrahim Halari*, 280 A.D. 420, 421 (1st Dep't 1952), *aff'd*, 305 N.Y. 866 (1953); *Durant v. Motor Vehicle Accident Indemnification Corp.*, 20 A.D.2d 242, 249 (2d Dep't 1964), *modified on other grounds*, 15 N.Y.2d 408 (1965). "Under New York law, post-verdict prejudgment interest is mandatory." *Adrian v. Town of Yorktown*, 620 F.3d 104, 107 (2d Cir. 2010). Unlike the arbitral award, which was plainly a "decision, award, or agreed settlement made as a result of an ADR process," Joint App'x at 60 ¶ 6, post-award prejudgment interest is a statutory requirement that falls inherently outside an arbitrator's authority and

within the authority of the courts. The ADR Endorsement does not clearly waive the parties' rights to interest accruing after the arbitral panel issued its decision.[6] Accordingly, we remand to the district court to calculate the interest accruing from August 7, 2019, the date on which the arbitral panel rendered its decision, through the date of judgment.

## III. Conclusion

In sum, we hold as follows:

(1) The district court did not err in denying TIG's motion to vacate the judgment in light of Judge Ramos's conflict;

(2) Because the parties' ADR Endorsement amounts to a binding arbitration agreement, the district court did not err in compelling arbitration; and

---

[6] Nor does it waive the parties' rights to post-judgment interest. *See* 28 U.S.C. § 1961(a).

(3) The district court erred in ordering TIG to pay pre-arbitral-award interest, but properly required TIG to pay interest for the period between the arbitral panel's award and the entry of judgment in the district court.

We therefore AFFIRM the district court's denial of the motion to vacate and the district court's order compelling arbitration, REVERSE in part its decision granting Exxon's request for prejudgment interest, and REMAND to the district court for further proceedings consistent with this opinion.